# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

XIAO MIN CHEN,

Petitioner,

v.

MICHAEL B. MUKASEY, Attorney
General,

Respondent.

No. 04-72413

Agency No.
A75-642-340

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 12, 2008—Pasadena, California

Filed June 3, 2008

Before: Stephen S. Trott, Richard R. Clifton, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Trott;
Concurrence by Judge Clifton

## COUNSEL

Howard Hom, Los Angeles, California, for the petitioner.

John M. McAdams and Paul Fiorino, United States Department of Justice, Washington, DC, for the respondent.

## OPINION

TROTT, Circuit Judge:

Xiao Min Chen, a native and citizen of China, seeks review of the Board of Immigration Appeal's ("BIA") decision affirming the immigration judge's ("IJ") decision declaring Chen's asylum application frivolous. At a hearing in April of

2002, Chen admitted that the contents of her asylum application were false, that the information she provided to an asylum officer in an April 1999 interview was false, and that the marriage and birth certificates she provided to the asylum officer were false. Consequently, the IJ found that, pursuant to 8 U.S.C. § 1158(d)(6), Chen had knowingly filed a frivolous application for asylum. Because a finding of frivolousness makes an alien permanently ineligible for benefits under the Immigration and Nationality Act ("INA"), the IJ denied both Chen's application for waiver of inadmissibility and her application for adjustment of status based on her marriage to a United States citizen.

Chen argues that because she withdrew the application prior to testifying in support of it and prior to a final determination on the application, the IJ erred. We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(2)(D), and in light of a recent decision in the Second Circuit, we grant the petition and remand to the BIA to determine in the first instance the proper interpretation of 8 U.S.C. § 1158(d)(6).

## I

## BACKGROUND

Chen entered the United States in 1998 on a non-immigrant P-3 visa to work as a folk dancer, but, after entering the United States, Chen never performed such work. The visa authorized her to remain in the United States until no later than April 26, 1999. When she stayed beyond that date, she was charged with and conceded removability.

In March of 1999, Chen presented an application for asylum, which we now know was rife with fraud. The signature page on the I-589 filed by Chen contains the following warning in bold font:

> Applicants in the United States illegally are subject
> to removal if their asylum or withholding claims are

not granted by an asylum officer or an immigration judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings, *even if the application is later withdrawn*. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the [INA].

(emphasis added). Additionally, the Notice of Privilege of Counsel and Consequences of Knowingly Filing a Frivolous Application for Asylum, served on Chen's attorney on August 31, 1999, contained the following warning: "If you knowingly file a frivolous application for asylum YOU WILL BE BARRED FOREVER from receiving any benefits under the [INA]."

In her application, Chen claimed that she was married in China to a man named Hua Zhou and had two children. She said that when she became pregnant with her second child, she and her husband feared that they would be punished by the Chinese government. In spite of this fear, the couple was determined to have the child.

According to her application, when Chen was nearly four months pregnant, the factory where she worked conducted a routine health checkup, and her pregnancy was discovered. Chen was ordered to the factory's office, and a hospital was contacted to perform an abortion. Chen claimed that the people at the factory "began to plot and force me to the hospital. I struggled with all my might. However I was finally forced to get into the factory's van because I was afraid of injury to the fetus."

When Chen got to the hospital, she felt nearly hopeless and "even thought of death." She refused to sign the required documentation until the staff agreed to let her call her husband to come to the hospital. While she was supposed to be making

the phone call, she ran outside and escaped in a taxi. After her escape, Chen claimed she could not go home because people from the factory went to both her house and her parent's house daily trying to find her. She stayed with relatives until the baby was born in May of 1998. In July of 1998, two months after the alleged birth of her second child, Chen came to the U.S. to escape the "nightmare" of her life in China.

In May of 1999, during a hearing, Chen was advised by an IJ that if she knowingly filed a frivolous application for asylum, she would be permanently barred from receiving immigration benefits. The IJ informed Chen that a "frivolous application for asylum is one which contains statements or responses to questions that are deliberately fabricated or made up." After Chen acknowledged that she understood the warning, the IJ said:

> Understanding that ma'am, do you still wish me to consider this application in deciding your request for asylum? Ma'am you should answer on your own because if this is a bad application that has frivolous information in it, you are the one whose [sic] barred forever, not this attorney. And I see you looking at him and he is giving you clues on how to answer by shaking his head. So you can do what he tells you by his head shakes but you're the one that's bound by it, ma'am. So take your answer very seriously because I'm not going to say later, Oh, that poor lady, she only said she wanted me to consider this document cause her attorney said to. I'm going to say, That lady told me to consider it and if it's frivolous ma'am, that's it on the benefits. No asylum, no withholding,[1] no Convention Against Torture, nothing. Do you understand?

---

[1] We note that the IJ was incorrect in stating that a frivolousness finding bars a petitioner from seeking withholding of removal. *See* 8 C.F.R. § 1208.20.

After being permitted time to go off the record and discuss the matter with her attorney, Chen told the IJ that she wished him to consider the application in deciding her request for asylum. Chen's attorney told the IJ "we'd like to have time to file some supplemental materials, maybe . . . and also maybe an affidavit." The IJ accepted Chen's application for filing and consideration and continued the removal hearing until November 15, 1999.

In November of 1999, Chen appeared before an IJ with new counsel. Her attorney informed the IJ that "we wish to perhaps do a withdrawal of the asylum and do an adjustment of status [based on Chen's marriage to Ping Yang, a U.S. citizen]." Counsel requested a continuance until January of 2000 to review the record, prepare, and file the adjustments. Chen's attorney told the IJ that, as of November 1999, Chen's husband had not yet filed an I-130 petition requesting a visa for Chen. He had also not filed an I-485 application for adjustment of status for Chen.

In January of 2000, Chen returned to court and told the IJ that her husband had filed an I-130 and an I-485 on her behalf. A status discussion of the I-130 was set for November of 2000, and the IJ requested Chen inform the court should the I-130 be approved prior to that date. In November of 2000, May of 2001, and November of 2001, Chen's counsel told the IJ that the I-130 had not yet been approved. The Immigration and Naturalization Service ("INS")[2] finally granted the I-130 petition in February of 2002.

On April 25, 2002, Chen and her attorney appeared before an IJ for a continued removal proceeding. During that proceeding, the following dialogue occurred:

---

[2]The INS was abolished on March 1, 2003, and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107-296, § 471, 116 Stat. 2135, 2205.

Judge to Ms. Calillo [Chen's counsel]

Q: And, counsel, off the record you indicated to me that you have reviewed the tapes. I was not the Judge starting this case and your understanding is this [application] has been previously withdrawn, but to be abundantly cautious in this case, are you going to withdraw the application?

A. Yes, Your honor.

. . .

Judge to Ms. Fontova [government counsel]

Q. Ms. Fontova, you indicated your file, as well as my file, does not indicate that there has been a withdrawal. Is that correct?

A. The notes didn't indicate such, Your honor.

. . .

Judge to Ms. Calillo

Q. So as of today, I'm showing, Ms. Calillo, that the asylum application has been withdrawn as indicated, that's what you are requesting.

. . .

Ms. Calillo to Judge

. . .

Q. If you'd like a date on when it was withdrawn, it was November 15th.

A. That's fine. No problem.

. . .

A. I've shown it's withdrawn. I believe you, it's just for clarification purposes so that Ms. Fontova's and my file, as far as the record, or [sic] paperwork will be clear.

In that same hearing, Chen testified that the contents of her asylum application were false, and that the information she provided to an asylum officer in an interview in April of 1999 was false. She further admitted that the marriage and birth certificates she provided to the asylum officer were false, and that she knew they were false when she provided them. Chen was not married in China, nor did she have any children in China. Chen confessed that she was actually married to Ping Yang, whom she met after entering the United States. The couple was married in the United States in October of 1999.

Chen has no children. She testified also that the information in her application indicating that she feared the Chinese government's birth control policy was false.

The IJ questioned Chen:

Q. Well, ma'am, how am I going to believe you today that you're married to this gentleman not for getting an immigration benefit when you have lied, in my opinion, to get your visa as a performer, and you have lied to the asylum officer in Anaheim to get asylum, it looks like you've lied to stay here on a number of occasions. How do I know that you didn't marry this guy just to get a green card because he is a citizen?

A. I'm sorry I did that because when I was first in the United States, I had no idea what I should do and

those people told me it was what I should do in order to remain here. They made up all the stories for me and wanted me to provide a name, any name in China so that they can make up a story for me. They asked me to memorize all the details in the statement in order to tell them the story during the interview.

Although somewhat confusing, additional testimony appears to indicate that during both Chen's first I-130 interview in March of 2000, and her second I-130 interview in February of 2002, she told the truth: that she had not been married in China and that she had no children. As a result, an overseas investigation into her marital status was instigated and subsequently confirmed that Chen had never been married in China and had no children.

At the conclusion of the April 2002 hearing, the IJ indicated that she believed Chen's current marriage was out of love, and asked counsel to brief the issues of whether Chen submitted a frivolous application and whether she was eligible for waiver under 8 U.S.C. § 1182(i). Under 8 U.S.C. § 1182(a)(6)(C)(i), "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." An alien may seek waiver of this provision pursuant to 8 U.S.C. § 1182(i), and in October of 2002, Chen filed an I-601, seeking such a waiver.

On February 23, 2003, the IJ entered her oral decision and order. The IJ, after reviewing the tapes, specifically found that Chen did not withdraw her application for asylum on November 15, 1999. She further concluded that although the misrepresentation to obtain a visa could be waived, the filing of a fraudulent asylum application could not. The IJ found that Chen knowingly filed a false application for asylum, and that Chen had notice of the consequences of filing a frivolous

application. Subsequently, the IJ denied Chen's application for waiver of inadmissibility pursuant to 8 U.S.C. § 1182(i). She denied also her application for adjustment of status. The IJ stated that "a later recantation of a story which is the basis of an asylum application does not waive the fact that a frivolous application was filed." The BIA affirmed without opinion.

## II

## STANDARD OF REVIEW

We review de novo an agency's application of a statute. *Cervantes-Gonzales v. INS*, 244 F.3d 1001, 1004 (9th Cir. 2001). We apply *Chevron* deference and uphold permissible interpretations of the statute by the agency. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999).

## III

## DISCUSSION

**[1]** The frivolous asylum application statute, 8 U.S.C. § 1158(d)(6), provides:

> If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

This provision applies "only if a final order by an [IJ] or the [BIA] specifically finds that the alien knowingly filed a frivolous asylum application." 8 C.F.R. § 1208.20. An application is frivolous "if any of its material elements is deliberately fabricated." *Id.* The notice required under 8 U.S.C. § 1158(d)(4)(A) is: "At the time of filing an application for

asylum, the Attorney General shall . . . advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum."

Chen raises a novel issue to this Court: Whether the withdrawal of an application after it is filed but before a final order is entered by an IJ renders irrelevant a subsequent finding by an IJ that the application was frivolous. Our answer to this question is in the negative.

We believe that the I-589's warning about the penalty for making a false statement, the I-589's warning about the penalty for making a frivolous application,[3] and the notice of consequences of knowingly filing a frivolous application that must be issued to a petitioner by an IJ pursuant to 8 U.S.C. § 1158(d)(4), all support the conclusion that the underlying purpose of the frivolousness statute is to prevent petitioners from lying to the United States government in order to obtain benefits under the INA. Chen received both of the written warnings. In addition to the written warnings, Chen received a lengthy warning from the IJ, and yet, in the face of all of these admonishments, she asked the IJ to consider her application for asylum.

In addition to the numerous warnings provided to petitioners, the language of 8 U.S.C. § 1158(d)(6) and its implementing regulation support our belief that withdrawing an application does not bar an IJ from making a frivolousness determination. The statute requires that the alien "knowingly *made* a frivolous application for asylum." (emphasis added).

---

[3]We note that the signature page on the 2007 version of the I-589 contains the warnings given to Chen and adds, "You may not avoid a frivolous finding simply because someone advised you to provide false information in your asylum application." I-589, Application for Asylum and Withholding of Removal (2007), *available at* http://www.uscis.gov/portal/site/uscis (follow "Immigration Forms" hyperlink; then follow "Application for Asylum and Withholding of Removal" hyperlink).

Furthermore, 8 C.F.R. § 1208.20, the regulation governing the determination as to whether an asylum application is frivolous, provides: "For applications filed on or after April 1, 1997, an applicant is subject to the provisions of [8 U.S.C. § 1158(d)(6)] only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly *filed* a frivolous asylum application." (emphasis added). The BIA recently observed that the Attorney General stated that the purpose of this regulation was to "carry[ ] out one of the central principles of the asylum reform process begun in 1993; to discourage applicants from making patently false claims." *In re Y-L-*, 24 I. & N. Dec. 151, 154 (BIA 2007) (citation and quotation marks omitted).

Chen argues, we believe incorrectly, that the comments to 8 C.F.R. § 1208.20 support her argument that a petitioner "should not be punished" for withdrawing a false application. The applicable comments in the Federal Register state:

> A commenter also suggested that an applicant should not be punished for voluntarily withdrawing an asylum application, and that the Department should advise adjudicators that, before finding that an individual filed a frivolous application, they should consider the fact that an applicant may not have been able to afford to retain counsel for advice on the legal strength of an asylum claim. The current regulation does not contain any provisions that punish an applicant for withdrawing an asylum application. Any applicant may choose to withdraw an application at any time prior to a final decision; however, a withdrawal does not preclude the Service from seeking removal of the alien if he or she is deportable or removable. The fact that an applicant may not have hired legal counsel may be one factor, among others, that an immigration judge or the Board may consider when determining whether an applicant had suffi-

> cient opportunity to account for any discrepancies or implausible aspects of the claim.

65 Fed. Reg. 76,121, 76,128 (Dec. 6, 2000). We do not believe that this language supports Chen's position. We agree with the government's argument that Chen is not being punished for *withdrawing* her application. The "punishment" is not for withdrawing the application several years after filing it, rather it is for making the frivolous application in the first place and lying to an asylum officer after being warned of the consequences. Chen received notice of the consequences of filing a frivolous application and chose to file and pursue the application in spite of the warnings.

We next consider the recent decisions of two of our sister circuits addressing the effect of withdrawal of an asylum application prior to a frivolousness finding. The Sixth Circuit, in *Lazar v. Gonzales*, 500 F.3d 469 (6th Cir. 2007), held that a petitioner's

> withdrawal of his asylum application did not obviate the need for the IJ to determine whether his false application should be deemed frivolous. Contrary to [petitioner's] contention, the IJ's frivolousness finding was not mooted by the withdrawal of his application. Indeed, if that were the law, every petitioner seeking relief under the INA would have an incentive to lie in their submissions because there would be no penalties for doing so.

*Id.* at 476-77.

In *Lazar*, the petitioner filed two applications for asylum. *Id.* at 472. In the first, he claimed persecution in Iraq on account of his political activities. He repeated this claim in his second application after he obtained new counsel. *Id.* Prior to his asylum hearing, he sought a continuance pending the outcome of his I-130 application for a visa based on his marriage

to a naturalized U.S. citizen. *Id.* The asylum hearing, how-
ever, was not continued at that time, and the IJ proceeded to
explain the consequences of filing a frivolous application to
the petitioner. *Id.* After receiving the warnings, the petitioner
affirmed that the contents of his application were "entirely
accurate" and declined to make any changes to the applica-
tion. *Id.* at 473. During the hearing, in response to questions
and documents submitted by the government, the petitioner's
admissions showed he had been untruthful in his second
application as well as in his testimony. *Id.*

The IJ continued the hearing for nearly a year to consider
whether or not the petitioner had submitted a frivolous appli-
cation. *Id.* The petitioner withdrew his application for asylum
prior to the continued hearing, requesting instead adjustment
of status based on his marriage to a U.S. citizen. *Id.* at 473-74.
At the continued hearing, the IJ acknowledged the petitioner's
withdrawal, but held nevertheless that the petitioner had filed
a frivolous application and was therefore not eligible for
adjustment of status. *Id.* at 474. The IJ held that "a prompt
recantation by an asylum applicant does not prevent a court
from deeming an asylum application frivolous." *Id.* The IJ
reasoned:

> There needs to be a general deterrent to all potential
> asylum applicants that they cannot lie to the Court or
> to the Immigration Service or there would be serious
> consequences. It also is a specific deterrent in each
> case before the Court or the Service, and that is to
> preclude this particular person from lying. Once the
> lie is done, he shot himself in the foot. And the fact
> that he then confesses the error of his way is of little
> and no import to the Court. Public policy dictates
> that recantation not be a viable option. But even if it
> were a viable option, the Court notes that the respon-
> dent did not recant his application. The respondent
> got caught with his hand in the cookie jar. What he
> did not know is the Government had evidence that

would demonstrate that his application was fake, phony and fraudulent. This, of course, would be an involuntary recantation, and the Court cannot see why any involuntary recantation, if you want to call it that, would preclude a finding of frivolousness. It would make a mockery of this system. But in any event, the respondent did not recant, he just confessed and it was a forced confession at that.

*Id.* at 474. The Sixth Circuit agreed with the IJ. *Id.* at 476-77.

In *Zheng v. Mukasey*, 514 F.3d 176 (2d Cir. 2008), however, the Second Circuit took a different approach than the Sixth, remanding to the BIA to interpret what it believed is ambiguous language in 8 U.S.C. § 1158(d)(6). In *Zheng*, the petitioner filed an application for asylum in 2000, alleging that birth control officials forced her to have an abortion. *Id.* at 178. In August of that year, the IJ gave the petitioner both a written and an oral warning as to the consequences of filing a frivolous asylum application. After acknowledging that she understood the consequences, the petitioner agreed that everything in her application was true and accurate. *Id.* at 179. In January of 2001, the petitioner withdrew her application and filed a new one, admitting that she had lied about her birth control claim in the first application. In an April 2003 hearing, the petitioner acknowledged again that she had lied. *Id.*

The Second Circuit: (1) determined that the petitioner received the procedural safeguards described in *In re Y-L-*, 24 I. & N. Dec. 151 (BIA 2007);[4] and (2) concluded that the

---

[4]*Y-L-* stated that the following requirements must be met in reaching a frivolousness finding:

(1)   notice to the alien of the consequences of filing a frivolous application; (2) a specific finding by the Immigration Judge or the Board that the alien knowingly filed a frivolous application; (3) sufficient evidence in the record to support the finding that a material element of the asylum application was deliberately fabri-

application contained deliberately fabricated material elements. *Zheng*, 514 F.3d at 180. The court then remanded the case to the BIA "to consider antecedent issues concerning the applicability of the frivolousness statute to an asylum application that is filed and then withdrawn before a decision on its merits." *Id.* at 181. The Second Circuit asked the BIA to consider two specific questions, one of which is relevant to the case at bar: "Is the IJ's authority to 'determine[ ] that an alien has knowingly made a frivolous application for asylum' limited to circumstances in which the IJ makes 'a final determination *on such application?*' " *Id.* (citing 8 U.S.C. § 1158(d)(6)) (alterations in original).

**[2]** In coming to the conclusion that remand was appropriate, the Second Circuit explained that the language of § 1158(d)(6) "is susceptible of at least two meanings." *Id.* The first possible construction is "that a frivolousness finding concerning an asylum application may take effect only after a final determination is made on the same application." *Id.* The court posited that if this interpretation were correct, the frivolousness finding against the petitioner must be vacated because the IJ did not make a final determination on the merits of the application. *Id.* Alternatively, the language could be construed to mean "that an IJ may make a frivolousness finding concerning an asylum application without also making a final determination on such application." *Id.*

We believe that the circumstances in Chen's case are similar to the circumstances of the petitioners in both *Lazar* and *Zheng*. Like the petitioners in *Lazar* and *Zheng*, Chen

cated; and (4) an indication that the alien has been afforded sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

24 I. & N. at 155; *see also* 8 C.F.R. § 1208.20. In the case at bar, neither party argues that the frivolousness finding violates the procedural safeguards set out in *Y-L-*.

received notice of the consequences of filing a frivolous application and chose to file it anyway. Additionally, in all three cases, once each petitioner came up with an alternative claim for benefits under the INA, he or she withdrew the false application. Furthermore, Chen's application, like that of the petitioner in *Zheng*, "unquestionably contained deliberately fabricated elements." *Id.* at 180. Finally, in all three cases, the IJ did not reach a final determination on the *merits* of the asylum application; rather, each IJ made a determination of the frivolousness of the application, ending the proceedings on this ground.

Our review of the required warnings, the language of the statute and its implementing regulations, and case law from our sister circuits reinforces our belief that the policy behind 8 U.S.C. § 1158(d)(6) is to prevent petitioners from making frivolous applications. Chen not only lied in her application, she lied also in her interview, obtained false documentation to support her lie, and only withdrew her asylum application after her I-130 status was granted. In light of these facts, we believe the result in *Lazar* is correct—withdrawal of an asylum application does not obviate the need for an IJ to determine whether a false application should be deemed frivolous. We do not believe that the language of the statute is ambiguous—in our view, the phrase "final determination on such application" refers not to a determination as to the merits of the application, but to a final determination as to whether the application is frivolous.

However, in spite of our belief that *Lazar* was correctly decided, in light of the Second Circuit's decision in *Zheng*, we remand to the BIA to interpret the language of section 1158(d)(6) in the first instance in order (1) to allow the agency itself to speak to this issue, and (2) to attempt to avoid making a decision later undercut by a different interpretation by the BIA in *Zheng*.

## IV

## CONCLUSION

**[3]** We remand to the BIA to determine: (1) whether the language of 8 U.S.C. § 1158(d)(6) requires an IJ to make a final determination on the merits of the asylum application, or whether the language requires only that an IJ make a final determination that the application itself was frivolous; and (2) whether the withdrawal of an application for asylum after it is filed renders a subsequent frivolousness finding by an IJ moot.

Petition **GRANTED** and **REMANDED**.

---

CLIFTON, Circuit Judge, concurring in the judgment:

I agree with my colleagues that this matter should be remanded to permit the agency to answer the relevant question in the first instance. I regret that I cannot join in that portion of the majority opinion that itself provides an answer to that question. *See, e.g.*, majority opinion at 6254. I do not disagree with the majority opinion's answer or the analysis upon which it is based, but if we think we should let the agency answer the question, then I believe that we should wait to hear that answer by the agency before providing our own.