**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 4, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NATHANAEL LUTUIMA
QUARESMA RIBAS,

Petitioner,

v.

No. 07-9509

MICHAEL B. MUKASEY, United
States Attorney General,[*]

Respondent.

---

**APPEAL FROM THE BOARD OF IMMIGRATION APPEALS**
**PETITION FOR REVIEW**

---

Submitted on the briefs:[**]

David C. Senger of Perrine, McGivern, Redemann, Reid, Berry & Taylor,
P.L.L.C., Tulsa, Oklahoma, for Petitioner.

Linda S. Wendtland, Assistant Director, John C. Cunningham, Senior Litigation
Counsel, Office of Immigration Litigation, Civil Division, U.S. Department of
Justice, Washington, D.C., for Respondent.

---

[*]     On November 9, 2007, Michael B. Mukasey became the United States
Attorney General.  In accordance with Rule 43(c)(2) of the Federal Rules of
Appellate Procedure, Mr. Mukasey is substituted for Alberto R. Gonzales as the
respondent in this action.

[**]     After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is
therefore ordered submitted without oral argument.

Before **TACHA**, **EBEL**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

Petitioner Nathanael Lutuima Quaresma Ribas seeks review of an order of the Board of Immigration Appeals (BIA) upholding an order of the immigration judge (IJ) finding that he filed a frivolous asylum application; denying his application for adjustment of status; and ordering him removed to Angola. Because Mr. Ribas received adequate notice of the consequences of filing a frivolous asylum application, and because his remaining issues have been waived or lack merit, we deny the petition for review.

**FACTS**

Mr. Ribas is a citizen of the Republic of Angola. He entered the United States on January 9, 2002, on a non-immigrant student visa. He lost his student status after he failed to pursue studies as planned at the University of Tulsa. The Department of Homeland Security issued him a notice to appear in removal proceedings on July 16, 2002.

**1. First Asylum Application**

On June 12, 2002, before he was placed in removal proceedings, Mr. Ribas filed his first, pro se, asylum application. He claimed he feared persecution from the government if he returned to Angola. He explained that his father had been

accused of being an undercover agent of the Union for the Total Liberation of Angola (UNITA). A guerilla leader had accused his father of passing state secrets to UNITA from the father's position within the Angolan defense ministry. Mr. Ribas asserted that his father, mother, brothers and sisters had been arrested, brutalized, and taken to an unknown location based on the guerilla leader's accusations. They were likely still in prison or dead. He stated that the Angolan government had already cancelled his scholarship to study in the United States and would torture him if he were returned to Angola.

The application for asylum form that Mr. Ribas signed warned him that "Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act." *Id.* at 662.[1] The asylum officer who reviewed his application found him only partially credible. Accordingly, he referred the case for proceedings before an immigration judge (IJ).

### 2. April 13, 2004 IJ Hearing

Mr. Ribas was initially scheduled for a hearing before the IJ on October 7, 2002. The IJ held a brief hearing on that date, during which Mr. Ribas appeared pro se and conceded the facts underlying the basis for removal, but stated that he

---

[1] The warning is obscured on page 662 of the record by a photograph of Mr. Ribas. But the parties do not dispute the language of the warning, which is also contained on the form reproduced on page 508 of the record in connection with his second asylum application.

wanted to pursue his asylum application. The IJ warned Mr. Ribas that "should it be determined that any of the information [on the asylum application] has been deliberately fabricated such a finding would result in the permanent bar [on] receiving immigration benefits in the future." *Id.* at 353.

At this point, Mr. Ribas's removal and asylum proceedings ground to a temporary halt. Angolan citizens, including Mr. Ribas, were granted "temporary protected status" (TPS) that shielded them from removal.

The TPS later expired and proceedings resumed in 2004. Mr. Ribas was scheduled for a hearing before the IJ on April 13 of that year. He appeared pro se at the hearing. He then explained to the IJ that he believed he would be persecuted for *religious* reasons if returned to Angola:

> Your Honor, I came here (Indiscernible), probably because I really cannot (indiscernible), because of my religious status, right now, I can't (Indiscernible.) I'll be persecuted, Your Honor, they don't believe in God. And (indiscernible) I'd be in danger (indiscernible).

*Id.* at 365.

The IJ found this position perplexing. He noted that the asylum application Mr. Ribas previously filed had listed membership in a particular social group as the basis for seeking asylum, and said nothing about being persecuted because of his adherence to Christianity.[2]

---

[2] Mr. Ribas did list his religious affiliation as "Christianity" on his first asylum application. Admin. R. at 655.

The IJ indicated it was a "problem" for Mr. Ribas that he had changed his story concerning the basis for asylum, but suggested that Mr. Ribas might want to file a new asylum application based on religious grounds. *Id.* at 367. He warned him, however, that he would need documentation to support his asylum claim. He then cautioned him about the consequences if his asylum claim failed:

> So, you need to get to work or you're going to be on an airplane flying back to Angola at the expense of the United States Government. Okay? And if you go out that way *you can't come back legally for ten years.*

*Id.* at 372 (emphasis added).

### 3. July 16, 2004 IJ Hearing

At the next significant hearing, on July 16, 2004, Mr. Ribas appeared with an attorney. His attorney stated he was abandoning his former application and wanted to submit a new asylum application. Mr. Ribas signed and submitted a new asylum application form during the hearing.

Mr. Ribas's new asylum application indicated he sought asylum based on religion, membership in a particular social group, and the Convention Against Torture (CAT). In an accompanying brief, he explained that he "converted to Evangelical Christian (Pentecostal) and this religion is not accepted by his family. His family is very powerful in Angola and have threatened him." *Id.* at 510. He further stated that "[h]is family are members of the government and those in

-5-

control of the country having the capability of punishing Mr. Ribas and they have the inclination to punish him." *Id.* at 512.

He explained away his previous asylum application, stating that it was based on information from his cousin who told him his family had been arrested because of his father's undercover activities as an agent for UNITA. His cousin had been mistaken. Mr. Ribas did not withdraw his application immediately after he learned that this information was false, he said, because he had already been given TPS.

His new claim was based on an incident in which

> [h]is mother entered the United States without his knowledge in September 2002 and confronted him. She kept him secluded and restricted him for several days, approximately one week, in an apartment with several Angolan men there to try to intimidate him into giving up his religion. His family stopped all financial support from him and if he returns to Angola he will be severely persecuted for his religious beliefs.

*Id.* at 514.

During the time he believed that his parents had been arrested by the Angolan government, Mr. Ribas admitted that he never asked his church to conduct a prayer vigil for them. Although such vigils were conducted at the church, he stated he did not get the church involved because he believed his parents' plight was a "personal matter." *Id.* at 489. He did not call his parents prior to August 2002 when he heard that they were all right, because he was scared. In closing, the government attorney called his story "one of the more

incredible stories I've heard in an asylum case" and urged the IJ to make a finding that the application was frivolous. *Id.* at 497-98.

### 4. IJ's Oral Decision

The IJ determined that Mr. Ribas "wanted to live in the United States rather than in Angola and . . . therefore he put together a frivolous asylum application and filed that and when that didn't work, now he has a new story." *Id.* at 331. As for the second application, "the basic claim is . . . that [Mr. Ribas] is afraid of returning to Angola because his mother resides there." *Id.*

The IJ then made a finding that the **first** asylum application was frivolous. He found Mr. Ribas's testimony in support of the second application "untruthful" and "preposterous even though his loving fans from church are inclined to give him the benefit of the doubt." *Id.* He therefore denied asylum, withholding of removal, and CAT relief, and made a finding that Mr. Ribas "has filed a frivolous asylum application and thus should be forever barred from the receipt of any United States immigration benefit." *Id.* at 333.

### 5. Appeal to the BIA

Mr. Ribas filed a timely appeal to the BIA. In his brief, he argued (1) he had not been given proper notice of the consequences of filing a frivolous asylum application; (2) the IJ did not give adequate consideration to his second asylum application; and (3) he had demonstrated past persecution and a well-founded fear of future persecution based on his Christian beliefs.

-7-

On November 16, 2005, the BIA issued its decision in the form of a one-judge, summary affirmance. The decision simply stated that the Board affirmed, without opinion, the results of the IJ's decision. Mr. Ribas did not seek review of the BIA's decision in this court.

### 6. Motion to Reopen

On February 14, 2006, Mr. Ribas filed a timely motion to reopen and remand the case to the IJ, based on newly-acquired eligibility for relief. He provided proof that on January 12, 2005, he had married a United States citizen, Jamila K. Ribas. She filed an Immigrant Petition for Relative (Form I-130) on his behalf on July 20, 2005. He contended he was entitled to an adjustment of status based on this petition that would prevent his removal to Angola.

The Department of Homeland Security (DHS) did not oppose the motion. Accordingly, on March 28, 2006, the BIA remanded to the IJ for further proceedings.

### 7. Proceedings on Remand

The matter came back before the IJ on May 3, 2006. He found that Mr. Ribas's proof of eligibility for adjustment of status did not overrule the prior finding that he had filed a frivolous asylum application. The BIA had not overturned the finding of frivolousness, which made Mr. Ribas ineligible for adjustment of status relief. The IJ therefore (1) pretermitted the application for adjustment of status; (2) again ordered Mr. Ribas removed to Angola; and

(3) certified the matter to the BIA to determine whether the Board considered the IJ's prior frivolousness finding final and applicable to the case.

### 8. Second BIA Decision

Mr. Ribas filed a brief with the BIA in connection with the IJ's certification order. He argued that the frivolousness order was not yet "final" and applicable to his application for adjustment of status. When the BIA reopened his case, he argued, this automatically vacated the frivolousness finding. He also argued that the frivolousness finding should not be upheld, because he was not given the statutorily-required notice before it was imposed.

The BIA issued its decision on January 25, 2007. It found, first, that there was no question that Mr. Ribas received the notice required by statute of the consequences of filing a frivolous application. This notice was provided both in writing on the asylum application and verbally by the IJ.

The BIA provided record citations to support its contention that Mr. Ribas received adequate notice. For written notice, it cited to the warning provided on the form associated with Mr. Ribas's *second* asylum application, which it stated (incorrectly) "was ultimately found to be frivolous." *Id.* at 2-3. For verbal notice, the BIA cited to the October 7, 2002 hearing transcript, in which the IJ advised Mr. Ribas that he would be permanently barred from relief if his asylum application contained deliberate fabrications.

The BIA also determined that the frivolousness determination had become final prior to the filing of the motion to reopen, notwithstanding the availability of the motion to reopen procedure. It noted that Mr. Ribas's motion to reopen did not request vacatur of the prior frivolousness finding. Nor did the BIA's order reopening the case and remanding to the IJ vacate that finding. Also, Mr. Ribas failed to seek review in the Tenth Circuit of the BIA's original order affirming the IJ's finding of frivolousness.

Finally, the BIA found that its previous decision to reopen the case had been erroneous. The prior finding of frivolousness made Mr. Ribas ineligible for adjustment of status even if he had a bona fide marriage. The BIA affirmed the IJ's decision denying relief and ordering him removed to Angola. Mr. Ribas filed a timely petition for review in this court.[3]

## ANALYSIS

### 1. Adequacy of Notice

Mr. Ribas argues that he received inadequate notice in connection with his first asylum application that he could be penalized for filing a frivolous application with a lifetime bar from relief. The relevant portion of the asylum statute states:

---

[3] Mr. Ribas filed his petition for review electronically within the thirty days allowed, then followed up with a written submission two days later. The government concedes that this represents a timely filing for jurisdictional purposes.

-10-

> If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien *has received the notice under paragraph (4)(A)*, the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

8 U.S.C. § 1158(d)(6) (emphasis added).  Thus, in order for the permanent bar to become effective, the alien must have "received the notice under paragraph (4)(A)."  That paragraph states:

> At the time of filing an application for asylum, the Attorney General shall--
>
> (A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum[.]

*Id.* § 1158(d)(4)(A).

Mr. Ribas argues that the IJ was charged with giving him the notice required under § 1158(d)(4)(A) and improperly failed to do so.  He contends that the IJ affirmatively misled him by telling him he would only be ineligible for immigration benefits for ten years if his application was deemed to be frivolous.  He further argues that the written notice he received was insufficient and that he should have been permitted to withdraw his application without penalty once he received the verbal notice.

The Attorney General responds that the BIA correctly found that Mr. Ribas received the notice required by the statute.  While acknowledging the BIA's mistake in stating that he received notice in connection with the *second*

-11-

application (not the first, which was the one actually found to be frivolous), the Attorney General contends (as the BIA did) that Mr. Ribas received adequate notice (1) in the first asylum application itself; and (2) from the IJ at the October 7, 2002 hearing.

### A. Exhaustion

At the outset, we are confronted by the Attorney General's insistence that Mr. Ribas did not exhaust before the BIA the issues he now presents involving the adequacy of the notice he received. Therefore, the Attorney General argues, this court should not consider them. But the Attorney General concedes that in the order under review, the BIA determined that Mr. Ribas received adequate notice and that the BIA cited both the verbal warning and the written warning. Issues involving the adequacy of this *combined* notice are therefore exhausted for purposes of review. *See Sidabutar v. Gonzales*, 503 F.3d 1116, 1120 (10th Cir. 2007) (stating that if BIA addresses issue not briefed by alien, that issue is exhausted and this court has jurisdiction over it).[4] Since Mr. Ribas simply attacks the very forms of notice on which the BIA expressly relied in upholding the lifetime bar, the issue of adequate notice is exhausted for purposes of review.

---

[4] A different problem is posed by the fact that Mr. Ribas did not raise these issues in his opening brief. But he did mention them in his reply brief, *see* Pet'r. Reply Br. at 8-12, and we did order the parties to address them in supplemental briefing.

But this leads us to a second problem. The BIA relied on both forms of notice, and did not state that either would have been individually adequate. If we were to find that either form of notice were problematic or deficient, agency law principles might require that the case be remanded to the BIA to determine whether the remaining notice was adequate. *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947) (stating federal courts will not affirm agency decisions based on reasoning not considered by the agency); *cf. INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (requiring remand for agency determination in first instance of matters "that statutes place primarily in agency hands"). On the other hand, if we determine that either form of notice was sufficient *as a matter of law*, such a remand would be unnecessary. *Cf. Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (stating court may supply "missing dispositive finding" in administrative decision where "no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way").

For the reasons stated in this opinion, we conclude that as a matter of law, the written notice Mr. Ribas received on the asylum form complied with § 1158(d)(4)(A) and provided him with all the notice to which he was entitled. This being the case, we may affirm the BIA's finding of adequate notice without the need to determine whether the additional verbal warning provided by the IJ was effective or sufficient.

-13-

### B. Warning Contained in the Application

As noted above, the application for asylum form that Mr. Ribas signed warned him that "Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act." *Id.* at 662. This appears to be a standard, boilerplate form of notice contained on the I-589 asylum application form. There is no factual dispute concerning its content.

We have located no cases holding that the written notice on the application is sufficient to meet the requirements of § 1158(d)(4)(A). Nor have we found any authority indicating that it is insufficient. At least two recent cases have noted that this is an unsettled question in the law. *See Luciana v. Attorney General*, 502 F.3d 273, 281 (3d Cir. 2007); *Biao Yang v. Gonzales*, 496 F.3d 268, 275 n.3 (2d Cir. 2007). The one published ruling by the BIA on this question merely notes that the asylum form (Form I-589) contains a written warning. It does not discuss whether that warning is sufficient. *In re Y-L-*, 24 I. & N. Dec. 151, 155 (BIA 2007).

While in general we are wary of determining significant issues not yet passed upon by the agency, *see Orlando Ventura*, 537 U.S. at 16, the notice issue here involves the proper interpretation of a statute under undisputed facts rather than the resolution of an issue committed in the first instance to agency determination, and may be resolved as a matter of law. We will therefore proceed

-14-

with statutory construction. *Cf. Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 313 n.15 (2d Cir. 2007) ("We, rather than the BIA, have primary authority under *Chevron* to determine whether a particular agency interpretation is consistent with the unambiguously expressed intent of Congress."), *cert. denied*, 128 S. Ct. 2472 (2008).

As in all cases of statutory construction, our foremost duty is to "ascertain the congressional intent and give effect to the legislative will." *Padilla-Caldera v. Gonzales*, 453 F.3d 1237, 1241 (10th Cir. 2005) (quotation omitted). "[I]t is a well established law of statutory construction that, absent ambiguity or irrational result, the literal language of a statute controls." *U.S. v. Saenz-Gomez*, 472 F.3d 791, 794 (10th Cir.) (quotation and citation omitted), *cert. denied*, 127 S. Ct. 2992 (2007). "Further, [w]hen the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent." *Id.* (quotation omitted).

Applying these principles, we note first that subsections 1158(d)(4)(A) and (d)(6) unambiguously require that the alien be advised that if the Attorney General determines that he knowingly made a frivolous application for asylum, he will be permanently ineligible for benefits under the Immigration and Nationality Act. Under the statute, this notice is to be provided "[a]t the time of filing" of the application. § 1158(d)(4). Although the Attorney General's regulations permit "filing" the application in a variety of different ways, including simply mailing

the form or presenting it at the IJ hearing, in each case the alien is required to complete and sign the asylum application form and to provide it to the agency. *See* 8 C.F.R. § 208.4(b). The only warning given at the "time of filing" in all such cases is that contained on the form itself.

Moreover, nothing in the statute requires that the notice be provided in verbal form or that the consequences of filing a frivolous application be explained in detail to the applicant.[5] While § 1158(d)(4)(A) requires the Attorney General to "advise" the alien of the consequences of filing a frivolous application, § 1158(d)(6) clarifies that this duty is fulfilled if the alien "has received the notice" required under § 1158(d)(4)(A).

In sum, in order to implement the statutory provisions, the Attorney General provides a written notice on its asylum form. The wording of this notice supplies all of the information concerning the consequences of filing a frivolous application to which the alien is entitled under the unambiguous language of § 1158(d)(4)(A). We therefore conclude, as a matter of law, that the written notice provided on the asylum form is sufficient.

Mr. Ribas urges a number of policy arguments against this conclusion. None of them demonstrates that application of the statute's plain language here

---

[5] We therefore do not find persuasive the Ninth Circuit's unexplained remark in *Chen v. Mukasey*, 527 F.3d 935, 940 (9th Cir. 2008), that "the notice of consequences of knowingly filing a frivolous application . . . must be issued to a petitioner *by an IJ* pursuant to . . . § 1158(d)(4)." (emphasis added).

would achieve an irrational result. *Saenz-Gomez*, 472 F.3d at 794. He argues that reliance on a "boilerplate" form is inappropriate where so much is at stake. Had Congress wished to provide a more explicit warning, however, it could have done so. He also suggests that his pro se status should be taken into account. But he makes no argument that he did not speak English well enough to read the warning or that he did not understand the warning.

Mr. Ribas notes that the BIA held in another context that unless both oral and written notice were provided, an alien who had been penalized for failure to appear had grounds for reopening his case to seek adjustment of status. *See In re M-S-*, 22 I. & N. Dec. 349, 352-57 (BIA 1998) (en banc). That case only supports the result we have reached here. The statute applied in *M-S-*, unlike § 1158(d), specifically required *verbal notice*. *Id.* at 352 (citing 8 U.S.C. § 1252(e)(1) (1994)).

Finally, Mr. Ribas argues that the IJ's later misstatement about a ten-year bar vitiated the notice he received on the application. This argument fails, in light of our determination that his asylum application was "filed" at the time he signed and submitted it, and the written notice he received prior to that time was sufficient to fulfill the statutory requirement. Any defect in a later verbal notice was irrelevant.

In addition, it appears Mr. Ribas may have misunderstood the import of the IJ's statement at the hearing on April 13, 2004. Taken in context, the advisement

may not even have been wrong.  Since the IJ did not specifically reference frivolousness when referring to a ten-year bar, he may simply have meant to accurately report the consequences if Mr. Ribas's asylum application were unsuccessful.  *See* 8 U.S.C. § 1182(a)(9)(B)(i)(II) (creating ten-year ineligibility period for aliens removed after more than one year of unlawful presence in United States).

### C.  Verbal Warning from IJ

As noted, the BIA also relied on the warning the IJ gave Mr. Ribas at the October 7, 2002 hearing.  This warning also appears to have conveyed the information required by § 1158(d).  But it was provided after Mr. Ribas had already filed the first application, for which he was sanctioned.  Therefore it is questionable whether this warning provided any meaningful notice at all, particularly since the IJ sanctioned Mr. Ribas for filing it, notwithstanding his later attempt to withdraw the first application.  Since we hold that the written notice provided on the asylum application was adequate in itself, however, we need not determine the efficacy of this later warning.

### 2.  Withdrawal of First Asylum Application

We asked the parties to brief whether the IJ had the power to make a finding of frivolousness with respect to Mr. Ribas's first asylum application, even though he later withdrew it.  The Attorney General responded that this issue had not been exhausted by presentation to the BIA and should therefore not be

considered. Upon consideration, we agree. *See* 8 U.S.C. § 1252(d)(1) (granting

reviewing court jurisdiction only where alien has exhausted administrative

remedies). We therefore will not consider this issue on the merits.

### 3. Finality of Frivolousness Finding

The bar on relief due to the filing of a frivolous asylum application

becomes "effective as of *the date of a final determination* on such application."

8 U.S.C. § 1158(d)(6) (emphasis added). Mr. Ribas therefore argues that the

frivolousness finding was not final at the time he requested a remand for

adjustment of status.

Mr. Ribas did not seek judicial review of the BIA's order affirming the IJ's

denial of asylum relief and the finding that his asylum application was frivolous.

Thus, the Attorney General argues that the review process was complete, and a

"final determination" was in place, at the time he requested adjustment of status.

Mr. Ribas argues, however, that the determination on his application was not

"final," because he pursued the collateral remedy of a timely motion to reopen,

and the BIA's order granting that motion to reopen "vacated" all prior orders

entered in the case.

The BIA rejected this argument, giving the following reasons:

[Mr. Ribas's motion to reopen] did not request vacatur of the
frivolous finding, and our order reopening and remanding this matter
did not address the previous frivolous finding. [Mr. Ribas] did not
pursue a further appeal of our decision summarily affirming the [IJ's]
denial of asylum and the entry of a frivolous finding with regard to

-19-

that application. Based upon that sequence of events, it now appears that our decision to reopen the matter was in error given the prior finding that the asylum application was frivolous. That finding, of course, renders [Mr. Ribas] ineligible for adjustment despite the fact that his marriage to a United States citizen may be *bona fide*.

Admin. R. at 3.

While there is some authority that "the grant of a motion to reopen vacates the previous order of deportation or removal and reinstates the previously terminated immigration proceedings," *Bronisz v. Ashcroft*, 378 F.3d 632, 637 (7th Cir. 2004), Mr. Ribas fails to cite any authority that this principle should be extended to vacate automatically an unchallenged finding of frivolousness. Moreover, the BIA later in effect rescinded its reopening of the case, calling it an error; rejected Mr. Ribas's contention that its prior order had affected the frivolousness finding; and reinstated the order of removal. Under these circumstances, Mr. Ribas fails to show that there was not a "final" order finding his application frivolous at the time he applied for adjustment of status.

### 4. Merits-Based Challenges to Frivolousness Finding

Mr. Ribas challenges the IJ's finding that his application was frivolous. As the Attorney General points out, Mr. Ribas forfeited these challenges by failing to seek review in this court from the BIA's November 16, 2005 order summarily affirming the IJ's frivolousness finding. We therefore lack jurisdiction to consider them.

-20-

### 5. BIA's Erroneous Reference to Second Asylum Application

As noted above, the BIA erroneously stated in its January 25, 2007 order that Mr. Ribas had been sanctioned for filing his *second* asylum application and received notice in connection with that application. We asked the parties to brief whether this mistake required a remand, or whether this court could reform the order to correct it. Mr. Ribas responded that the order could be reformed, but that remand was required for the other reasons outlined in his arguments. The Attorney General responded that reformation was not required but that this court could reform the order if necessary for a proper resolution of the appeal. We now reform the BIA's order to correct the error.

### CONCLUSION

Mr. Ribas received adequate notice on the asylum application form he filed that his knowing filing of a frivolous asylum application would result in permanent ineligibility for benefits under the Immigration and Nationality Act. We therefore affirm the BIA's order denying his application for adjustment of status, filed after he became ineligible for that benefit. His remaining challenges to the BIA's order of removal either have been forfeited or lack merit. We therefore DENY the petition for review. The BIA's January 25, 2007 order is hereby REFORMED to read that the IJ found Mr. Ribas's first asylum application frivolous, rather than his second application.