In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2864

IULIU IOAN ALBU,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent*.

On Petition for Review of a Final Order of
the Board of Immigration Appeals.
No. A 097 599 836

ARGUED FEBRUARY 10, 2014 — DECIDED AUGUST 5, 2014

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and
KENDALL, *District Judge*.[*]

WOOD, *Chief Judge*. Petitioner Iuliu Ioan Albu is a Roma-
nian citizen who applied for asylum in the United States in
2003. His application would have been deficient in a number

---

[*]Of the Northern District of Illinois, sitting by designation.

of ways, but at the prompting of his attorney he decided to
solve that problem by papering over his shortcomings with
lies. When his deceit came to light, he found himself on the
business end of 8 U.S.C. § 1158(d)(6), which makes any per-
son who files a frivolous asylum application permanently
ineligible for any immigration benefits whatsoever. He was
placed in removal proceedings, and in due course both the
Immigration Judge (IJ) and Board of Immigration Appeals
(BIA) applied section 1158(d)(6)'s statutory bar and denied
him cancellation of removal. He has petitioned for review of
that decision, but we find no error, and so we deny his peti-
tion.

Albu arrived in the United States from Romania in 1999.
Sometime between then and 2003, he retained a California
attorney named Jagprit Sekhon to file an asylum application
on his behalf. Sekhon, it turned out, was a specialist in the
field of false asylum applications; in 2009 he was convicted
of asylum fraud for filing more than 1200 false applications.
See News Release, "3 Sacramento attorneys receive lengthy
sentences in asylum fraud scheme investigated by ICE HSI,"
Immigration & Customs Enforcement (Sept. 24, 2010),
http://www.ice.gov/news/releases/1009/100924
sacramento.htm (last visited August 5, 2014). The Romanian
interpreter who worked with Albu was convicted in the
same prosecution.

In Albu's case, Sekhon did more than just shore up his
client's claim of a well-founded fear of persecution. He be-
gan by falsely alleging that Albu was arrested and beaten by
Romanian police on account of his Hungarian background
and Pentecostal religion. There was a grain of truth there:
Albu was indeed of Hungarian descent, but he did not con-

vert to Pentecostalism until he arrived in the United States, and he never suffered official mistreatment in Romania on that basis. Sekhon also falsified Albu's date of entry into the United States in order to avoid the statutory requirement that asylum applications be filed within one year of entry. See 8 U.S.C. § 1158(a)(2)(B). Before Albu met with an asylum officer for an interview in California (because Sekhon had also falsely represented that Albu lived there rather than at his real home in Illinois), Sekhon gave Albu the fraudulent application and told him to memorize the details. Albu complied.

Albu's signed application contained the warning, "Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act." On top of that, when he attended his asylum interview Albu signed an oath stating that he knew that he was required to tell the truth under penalty of perjury, and that he would be "permanently ineligible for any benefits under the Immigration and Nationality Act if [he] knowingly made a frivolous application for asylum." He was accompanied by a Romanian interpreter at this interview. The interpreter certified on the form containing Albu's oath that he had interpreted the warning into Romanian for Albu.

Albu kept the ruse up long enough to gain an initial recommendation of approval from the Department of Homeland Security (DHS). Things began to unravel, however, before Albu was granted final approval. For reasons that are unexplained but that probably relate in part to the investigation of fraud that led to Sekhon's conviction, DHS held Albu's application for seven years. When Albu did not attend a

second asylum interview scheduled in San Francisco for September 2010, DHS cancelled his recommended approval and issued a Notice to Appear in the Immigration Court in Chicago. He conceded removability before the IJ and withdrew his asylum application. In its place, he filed an application for cancellation of removal under 8 U.S.C. § 1229b(b)(1).

The IJ ordered Albu removed. He applied the frivolous asylum application bar over Albu's argument that, although he knew the application was false, he did not understand the consequences of filing a false application because they were written in English, a language he did not understand. He further argued that although the interpreter indicated that he had translated the warnings, that interpreter was convicted as part of Sekhon's asylum-fraud ring and therefore had an incentive to lie about whether he had warned Albu of the consequences of filing a false application. Albu testified that he did not recall whether the interpreter gave the warnings in Romanian, but the IJ found incredible any testimony to the effect that Albu did not know the application was false or that he did not know the consequences of lying. The IJ held in the alternative that even if the frivolous-application bar did not apply, Albu had not met the burden of establishing eligibility for cancellation of removal.

The BIA affirmed with a short opinion, largely adopting the IJ's finding that the frivolous-application bar applied and holding that the IJ did not commit clear error in making an adverse credibility determination. See 8 C.F.R. § 1003.1(d)(3)(i) (establishing BIA standard of review). The BIA did not address whether Albu had made the necessary showing of eligibility for cancellation of removal without regard to the frivolous-application bar.

We review legal determinations of the BIA, and the IJ to the extent they are adopted by the BIA, *de novo*. *Duron-Ortiz v. Holder*, 698 F.3d 523, 526 (7th Cir. 2012). We will uphold factual determinations if they are supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

Under 8 U.S.C. § 1158(d)(6),

> If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

Paragraph (4)(A) in turn requires that at the time an asylum-seeker files an application, the Attorney General shall "advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum." 8 U.S.C. § 1158(d)(4)(A). According to Department of Justice regulations, an application is frivolous if "any of its material elements is deliberately fabricated." 8 C.F.R. § 1208.20.

Whether an application is false is a question of fact, as is the question whether that falsehood was material and made knowingly. *Siddique v. Mukasey*, 547 F.3d 814, 816 (7th Cir. 2008). Albu does not contend that he was unaware of the lies in his application, nor does he argue that they were immaterial. Instead, he rests his entire petition on the rule that an applicant must have received notice of the severe consequences of filing a false application before those conse-

quences can be applied. See 8 U.S.C. § 1158(d)(4)(A); see also *Matter of Y-L-*, 24 I. & N. Dec. 151, 155 (B.I.A. 2007).

Normally, warnings given on the application itself or at the time of the asylum interview are enough to satisfy this requirement. See *Pavlov v. Holder*, 697 F.3d 616, 618 (7th Cir. 2012); see also *Cheema v. Holder*, 693 F.3d 1045, 1048–50 (9th Cir. 2012); *Ribas v. Mukasey*, 545 F.3d 922, 929–30 (10th Cir. 2008). Though Albu was warned at both junctures, this case presents the added (but not uncommon) wrinkle of his limited English proficiency—a problem that was explicitly absent from *Pavlov*. See 697 F.3d at 618–19 (explaining that the IJ did not credit Pavlov's argument that he did not understand English, because he testified in perfect English and declined a translator when offered).

Even so, Albu had an interpreter with him at his asylum interview, and the interpreter represented to the government that he translated the warnings. Albu now tries to raise doubts about the honesty of the interpreter's representation; he suggests that the interpreter had an incentive to keep Albu in the dark and lie to the government, in order to prevent Albu from revealing that the application was deceitful and thus exposing the Sekhon ring's scheme. But the question whether the warnings were translated is one of fact that the IJ was entitled to resolve. He did so by finding that the translation took place, and that finding is supported by substantial evidence in the record. The documentary evidence indicated that the warnings were translated; Albu testified only that he could not recall whether this was the case, not that they definitively were not. At any rate, the IJ made a finding that Albu was not credible, and this finding is well within the realm of reason.

Albu also asserts that his due process rights were violated during his removal proceedings. Noncitizens have a Fifth Amendment right to due process in immigration proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993). When an immigration statute guarantees a petitioner a fair hearing, however, and that statute has been followed, this court generally will not find an unconstitutional deprivation of due process. *Kadia v. Gonzales*, 501 F.3d 817, 824 (7th Cir. 2007). Albu had a full hearing. He nonetheless argues that the IJ deprived him of due process by focusing on the "wrong facts" when deciding whether he received warning of the consequences of filing a false application. This claim, however, is indistinguishable from a straightforward claim that the IJ's decision was not supported by substantial evidence on the record. Albu is complaining not of a deficiency in the process, but of an allegedly incorrect determination on the merits. We have already dealt with that argument, and so will conclude by saying only that we find no deprivation of due process on this record.

The petition for review is DENIED.