RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0255p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

GILBERTO GARCIA-ROMO,

 *Petitioner*,

 *v.*

WILLIAM P. BARR, Attorney General,

 *Respondent*.

⎤
⎟
⎟
⎟
⎬  No. 18-3857
⎟
⎟
⎟
⎦

───────────────

On Petition for Review from the Board of Immigration Appeals;
No. A 205 151 390.

Argued: August 7, 2019

Decided and Filed: October 4, 2019

Before: ROGERS, BUSH, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Alexander H. Park, LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C., Memphis, Tennessee, for Petitioner. Michelle R. Slack, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Alexander H. Park, Rehim Babaoglu, LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C., Memphis, Tennessee, for Petitioner. Brooke M. Maurer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

───────────────

## OPINION

───────────────

JOHN K. BUSH, Circuit Judge. This case presents the following central question: may "a notice to appear" for a removal proceeding under 8 U.S.C. §§ 1229(a), 1229b(d)(1) be served

upon a noncitizen[1] through service of more than one written communication and still constitute such "notice" if those multiple installments collectively give the noncitizen all of the information required to be provided by § 1229(a)(1)(A)-(G)?  Petitioner, Gilberto Garcia-Romo, a noncitizen, says no.  He argues that "a notice to appear" means that all of the information required by § 1229(a)(1)(A)-(G) must be provided in a single document served upon him in order for such "notice" to be effectuated.  As discussed below, we disagree, and for that principal reason we deny Garcia-Romo's petition for review of a final order of his removal from this country as affirmed by the Board of Immigration Appeals ("BIA" or "Board").

Before addressing the "notice to appear" issue, however, we should explain how this issue arises here.  Garcia-Romo filed an application with the Immigration Court to cancel his removal order, seeking a form of discretionary relief that the Attorney General may grant to noncitizens to allow them to remain in the United States if they meet certain eligibility requirements under 8 U.S.C. § 1229b(b)(1).  One of those requirements is that the alien "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application."  *Id.* § 1229b(b)(1)(A).  Under the "stop-time" rule set forth in § 1229b(d)(1), the accrual period of continuous physical presence is "deemed to end . . . when the alien is served a notice to appear under section 1229(a)."  A "notice to appear," as defined and referred to in § 1229(a)(1), specifies that the noncitizen be provided with written notice of several different categories of information, described in subsections (A)-(G) of that statutory provision.  One of those categories is "[t]he time and place at which the [removal] proceedings will be held."  *Id.* § 1229(a)(1)(G).

Garcia-Romo received a document entitled "Notice to Appear" from the Department of Homeland Security ("DHS") that contained all of the required information under § 1229(a)(1)(A)-(G) except for the time and date of the removal proceedings.  The Immigration Court later sent Garcia-Romo a document entitled "Notice of Hearing in Removal Proceedings," which provided the required time-and-date information.  Thus, there is no dispute that, through

---

[1]Consistent with the Supreme Court, we use the term "noncitizen" in this opinion "to refer to any person who is not a citizen or national of the United States." *Pereira v. Sessions*, 138 S. Ct. 2105, 2110 n.1 (2018) (citing 8 U.S.C. § 1101(a)(3)).

the two referenced written communications, Garcia-Romo received all of the categories of information required to be served by § 1229(a)(1)(A)-(G).  Nonetheless, relying on *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), Garcia-Romo argues that the stop-time rule was never triggered in his removal proceedings because he never received a single document that contained all requisite categories.

For the reasons explained below, in light of the ordinary meaning of the relevant statutory text, the stop-time rule is triggered when a noncitizen has received all of the required categories of information of § 1229(a)(1)(A)-(G) whether sent through a single written communication or in multiple written installments.  Even if the statutory text were ambiguous, we would be required by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) to defer to the BIA's interpretation of the statute, which accords with ours.  We therefore **DENY** Garcia-Romo's petition for review.

## I.

Garcia-Romo is a native and citizen of Guatemala who entered the United States without the government's authorization sometime in 2002.  On February 29, 2012, DHS served Garcia-Romo with a document entitled "Notice to Appear."  A.R. at 794–95.  The document indicated that Garcia-Romo was charged as subject to removal under 8 U.S.C. § 1182(a)(6)(A)(i) and ordered him to appear "on a date to be set at a time to be set" to show why he should not be removed from the United States.  A.R. at 794.  Approximately two months later, on April 30, 2012, Garcia-Romo received another document entitled "Notice of Hearing in Removal Proceedings," indicating that his removal proceedings were scheduled on December 19, 2012, at 9:00 a.m.  A.R. at 793.

During the December proceedings, Garcia-Romo, appearing with counsel, indicated that he would apply for cancellation of removal and also conceded his charges of removability.  A little over two years later, on February 25, 2014, Garcia-Romo timely filed his "Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents," arguing that he was eligible for relief under 8 U.S.C. § 1229b(b).  After a hearing, the immigration judge denied Garcia-Romo's application for cancellation of removal.

The immigration judge reasoned that Garcia-Romo failed prove that he had been continuously present in the United States for the ten years preceding the service of his February 29, 2012 "Notice to Appear." To support this conclusion, the immigration judge pointed to evidence in the administrative record showing that Garcia-Romo "was arrested by immigration officials on April 25, 2005 and was voluntarily removed to Mexico." A.R. at 63.

Garcia-Romo appealed the immigration judge's order, and on August 17, 2018, the BIA dismissed the appeal. The BIA concluded that Garcia-Romo's "accrual of continuous physical presence for cancellation purposes was terminated by the February 29, 2012, service of the Notice to Appear . . . in combination with the subsequent Notice of Hearing dated April 30, 2012, informing the respondent of the date, time and place of his hearing." A.R. at 3 (citing 8 U.S.C. § 1229b(d)(1); *Pereira v. Sessions*, 138 S. Ct. 2105 (2018)). Thus, Garcia-Romo "needed to demonstrate that he was continuously physically present in the United States for 10 years prior to the receipt of his April 30, 2012 Notice of Hearing." The BIA held that Garcia-Romo failed to make this showing, because of the evidence showing that Garcia-Romo was apprehended and returned to Mexico in April 2005. Accordingly, the BIA dismissed the appeal.

This timely petition followed.

**II.**

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citation omitted). "To the extent the BIA adopted the immigration judge's reasoning, however, [we] also review[] the immigration judge's decision." *Id.* (citation omitted). We review questions of law de novo, "but substantial deference is given to the BIA's interpretation of the [Immigration and Nationality Act] and accompanying regulations." *Id.* (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)). The immigration judge's and the Board's factual findings, by contrast, are reviewed under the substantial-evidence standard. *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007). Thus, the immigration judge's and the Board's factual findings "are conclusive

unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

Before we turn to the crux of this case, we must address the government's assertion that we lack jurisdiction because Garcia-Romo did not exhaust his administrative remedies. As the government sees it, Garcia-Romo failed to exhaust his administration remedies because he "did not include in his appeal to the Board any argument regarding the sufficiency of the [notice to appear] or subsequent notice of hearing and whether the service of those documents effectively triggered the stop-time rule for cancellation of removal." Resp't Br. at 7.

Under the Immigration and Nationality Act, this court has jurisdiction to review "constitutional claims or questions of law" presented in a timely petition for review. 8 U.S.C. § 1252(a)(2)(D). However, as required by the statute, a court of appeals "may review a final order of removal only if," in addition to one other requirement not relevant here, "the alien has exhausted all administrative remedies to the alien as of right." *Id.* § 1252(d)(1); *see also Suassuna v. INS*, 342 F.3d 578, 583 (6th Cir. 2003) ("The statute governing [the courts of appeals' jurisdiction] to review an order of deportation requires the exhaustion of administrative remedies."). "The purpose of section 1252(d)(1)'s exhaustion requirement is (1) to ensure that the agency responsible for constructing and applying the immigration laws and implementing regulations, has had a full opportunity to consider a petitioner's claims; (2) to avoid premature interference with the agency's processes; and (3) to allow the BIA to compile a record which is adequate for judicial review." *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010) (alteration omitted) (quoting *Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004)).

As a general rule the exhaustion requirement requires that the petitioner press all reviewable issues to the BIA and each issue "must be reasonably developed in the petitioner's brief to the BIA." *Khalili*, 557 F.3d at 432–33 (citing *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006); *Hasan v. Ashcroft*, 397 F.3d 417, 420 (6th Cir. 2005)). However, when the Board sua sponte decides an issue not formally presented to it in the party's briefing or in the party's Notice of Appeal, "the BIA's action waives that issue's exhaustion requirements." *Khalili*, 557 F.3d at 435.

In its opinion below, the BIA concluded that "accrual of continuous physical presence for cancellation purposes was terminated by the February 29, 2012, service of the Notice to Appear (NTA) . . . in combination with the subsequent Notice of Hearing dated April 30, 2012, informing the respondent of the date, time and place of his hearing." A.R. at 3 (citing 8 U.S.C. § 1229a(d)(1); *Pereira v. Sessions*, 138 S. Ct. 2105 (2018)). The Board reached this conclusion without invitation or argument from Garcia-Romo or the government. True, as the government noted at oral argument, the BIA summarily concluded without reasoned analysis that the stop-time rule was triggered after the service of the Notice of Hearing dated April 30, 2012. Oral Arg. at 14:12–32. But that does not mean that the BIA did not raise the issue sua sponte. Indeed, if the Board did not wish to address the issue of whether the ten-year continuous presence requirement was satisfied, it could have considered the issue forfeited and dismissed the appeal because of Garcia-Romo's failure to brief when the accrual period ended. *See* 8 C.F.R. § 1003.1(d)(2)(i). Instead, the BIA decided that the "Notice to Appear" (which omitted time-and-date information) and the subsequent "Notice of Hearing in Removal Proceedings" (which included the previously omitted time-and-date information) triggered the stop-time rule in this case and that substantial evidence in the record supported the immigration judge's conclusion that Garcia-Romo did not satisfy the continuous presence requirement under 8 U.S.C. § 1229b(b)(1)(A).

Thus, when the BIA concluded that the stop-time rule was triggered in this case, Garcia-Romo was entitled to challenge this aspect of the BIA's decision in a petition for review in this court. The BIA's determination that the "Notice of Hearing in Removal Proceedings," dated April 30, 2012, triggered the stop-time rule must be based on a permissible reading of the statute. And if the BIA erred in reaching this sua sponte conclusion, the exhaustion requirement under 8 U.S.C. § 1252(d)(1) does not bar Garcia-Romo from raising this issue in a petition for review in this court. Accordingly, we have jurisdiction to reach the merits of Garcia-Romo's sole issue in this petition.

**III.**

As indicated above, the issue before us is whether the government is required to satisfy the requirements of 8 U.S.C. § 1229(a)(1)(A)-(G) in a single document, rather than in multiple

installments, in order to serve "a notice to appear" as used in § 1229b(d)(1) and thus trigger the stop-time rule in that latter statutory provision.

We consider this legal question of statutory interpretation de novo.  *See United States v. Kassouf*, 144 F.3d 952, 955 (6th Cir. 1998).  We start with the text of the relevant provisions—here, 28 U.S.C. §§ 1229(a)(1), 1229b(d)(1)—"giving the words used their ordinary meaning," *Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018) (citation and internal quotation marks omitted), based on usage at the time of the statute's enactment, *see, e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citations omitted); *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018).  The words are to "be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citation omitted); *see also Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*, 654 F.3d 654, 657 (6th Cir. 2011) ("Plain meaning is examined by looking at the language and design of the statute as a whole." (citation omitted)).

Under this statutory scheme, Congress has given the Attorney General the discretion to cancel the removal or adjust the status of certain nonpermanent residents.  8 U.S.C. § 1229b(b). A nonpermanent resident who applies to cancel her or his removal order must show, among other requirements,[2] that she or he "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application."  8 U.S.C. § 1229b(b)(1)(A).  Although § 1229b(b)(1)(a) establishes that the ten-year period is measured by the "date of such application," Congress also established a separate stop-time rule that measures the ten-year period based on different intervening events.  *Id.* § 1229b(d)(1).  Relevant here is the provision under § 1229b(d)(1), which states that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the [noncitizen] is served a notice to appear under section 1229(a) of this title."  § 1229b(d)(1).[3]

---

[2]The noncitizen also must demonstrate that she or he has been a person of good moral character during the ten-year period and has not been convicted of an offense listed under the statute, and must establish that removal would result in exceptional and extremely unusual hardship to the noncitizen's spouse, parent, or child who is a citizen of the United States or a noncitizen who is a lawful permanent resident.  8 U.S.C. § 1229b(b)(1)(B)-(D).

[3]The statute indicates that the stop-time rule also may be triggered when a noncitizen commits an offense referred to in § 1182(a)(2) that in turn renders her or him removable or inadmissible.  8 U.S.C. § 1229b(d)(1)(B).

The text clearly indicates that the noncitizen must receive "a notice to appear under 1229(a)" to trigger the stop-time rule. Based upon the cross-reference to § 1229(a) and express reference to "a notice to appear" in § 1229b(d)(1), only "a notice to appear" described in paragraph (1) of § 1229(a) will trigger the stop-time rule. *Accord Pereira*, 138 S. Ct. at 2114 ("It is true . . . that the stop-time rule makes broad reference to the notice to appear under 'section 1229(a),' which includes paragraph (1) as well as paragraphs (2) and (3). But the broad reference to § 1229(a) is of no consequence, because . . . only paragraph (1) bears on the meaning of 'notice to appear.'" (internal citations omitted)).

Section 1229(a)(1), in turn, describes "a notice to appear" and states, "[i]n removal proceedings under section 1229a of this title, written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien . . . specifying" the required categories of information listed in subsections (A) through (G). As explained in *Pereira*, this is "quintessential definitional language." 138 S. Ct. at 2116. In other words, the statute sets forth the necessary categories of information that a noncitizen must receive in her or his "written notice" in order for such notice to qualify as "a notice to appear" under § 1229(a)(1). This, of course, requires that the noncitizen be given notice of all of the categories in § 1229(a)(1)(A)-(G), including "[t]he time and place at which the proceedings will be held." 8 U.S.C. § 1229(a)(1)(G)(i).

There is no question that the document Garcia-Romo received bearing the title "Notice to Appear"—which lacked the requisite time-and-date information, but otherwise contained all the other required information under § 1229(a)(1)— was not, standing alone, sufficient to qualify as "a notice to appear" within the meaning of § 1229(a)(1) for purposes of triggering the stop-time rule. *Pereira*, 138 S. Ct. at 2114, 2116. But that does not answer the question of whether the government can meet its notice obligation under § 1229(a) by sending Garcia-Romo a second written communication, as it did through the "Notice of Hearing in Removal Proceedings," that provides him with the time-and-date information that was missing in the first communication.

Garcia-Romo argues that the statute precludes the government from "curing" its incomplete initial communication with a supplemental communication. To support his interpretation, Garcia-Romo focuses on the provision in § 1229b(d)(1) stating that service of

"*a* notice to appear" triggers the stop-time rule. (emphasis added). This language, according to Garcia-Romo, "mandates service of *a* singular, compliant document" which contains "all of the information required by Section 1229(a)(1)(A) through (G)." Pet'r Br. at 12.

This interpretation of the statute lacks merit. It gives too cramped a reading to the meaning of the indefinite article "a" as understood in ordinary English. When the word "a" precedes a noun such as "notice," describing a written communication, the customary meaning does not necessarily require that the notice be given in a single document. Rather, there may be multiple communications that, when considered together, constitute "a notice."

Consider, for example, an editor who tells an author that if she sends him "a book" he will get it published. Suppose that, rather than send all chapters at once, the author submits her writing piecemeal as it is drafted. Once she has sent all of the chapters to her editor, has she sent "a book"? Most people would say yes. Maybe the editor expected that he would receive the book in one submission, but the multiple installments nonetheless constitutes "a book" as English is commonly used.

Or suppose a professor assigns each of her students to write "a paper." The professor explains that, for purposes of the assignment, the paper must contain an introduction, a body, and a conclusion. One student turns in a document with an introduction and a body but neglects to submit the conclusion. Once the student discovers that the conclusion is missing, he makes arrangements to get it to the professor. Has the student submitted "a paper" even though he made two submissions? Most would say he has. The student has submitted multiple written communications, that when combined, meet the professor's definition of "a paper" because they provide all of the information required by professor to be included in the paper.

As these examples demonstrate, the use of the indefinite article "a" before a word that describes written communication does not necessarily mean that delivery of the message must be in one transmission. This principle reflects ordinary usage of the indefinite article "a" with respect to physical objects in general. For example, "[i]f a girl should say that she wanted a dress made from *a piece* of red satin, she would not signify that all the material required would have to be in one piece. The goods might be in several lengths, each length used for a particular

part of the dress." Margaret M. Bryant, *English in the Law Courts: The Part That Articles, Prepositions, and Conjunctions Play in Legal Decisions* 40–41 (1962) (emphasis added).

Similarly, here, written communications to a noncitizen in multiple components or installments may collectively provide all the information necessary to constitute "a notice to appear" under 8 U.S.C. § 1229b(d). Thus, the government triggers the stop-time rule when it sends a noncitizen all the required categories of information under § 1229(a)(1)(A)-(G) through one or multiple written communications.

## IV.

Contrary to what Garcia-Romo argues, the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018) does not compel a different interpretation than the ordinary meaning applied above. The *Pereira* Court answered the following "narrow question": "If the Government serves a noncitizen with a document that is labeled 'notice to appear,' but the document fails to specify either the time or place of the removal proceedings, does it trigger the stop-time rule?" 138 S. Ct. at 2110. In that case, the noncitizen (Pereira) received a document entitled "Notice to Appear" that met all the requirements of § 1229(a)(1) with the exception that it failed to list the time and date when the proceedings would be held. *See id.* at 2113. That document was personally served on Pereira on May 31, 2006. *Id.* at 2112. The immigration court then mailed Pereira "a more specific notice setting the date and time for his initial removal hearing for October 31, 2007, at 9:30 a.m." *Id.* "But that second notice was sent to Pereira's street address rather than his post office box (which he had provided to DHS), so it was returned as undeliverable." *Id.* "In 2013, after Pereira had been in the country for more than 10 years," he was arrested for a "minor motor vehicle violation" and subsequently entered removal proceedings. *Id.* The BIA and the First Circuit agreed that the stop-time rule was triggered in 2006 by the notice he received in person. *See id.* at 2112.

But the Supreme Court disagreed. Because the Court concluded that the 2006 document did not trigger the stop-time rule, Pereira satisfied the ten-year continuous presence requirement in § 1229b(b)(1). *See id.* at 2112. In reaching this conclusion, the Court had no occasion to determine whether the government would be able to supplement the initial written

communication lacking all the required disclosures of § 1229(a)(1) through a subsequent document providing the missing information to trigger the stop-time rule because the government never successfully served Pereira with a supplemental communication that included the time-and-date information. Thus, the *Pereira* holding does not control the outcome of this case.

Garcia-Romo nonetheless contends that "the Supreme Court made clear that the Government may not cobble together a notice to appear through several separate documents which serve to 'complete' the original, defective notice to appear." Pet'r Br. at 13. *Pereira* does not say this. To understand why, consider the dialogue between the dissenting and majority Supreme Court opinions in that case.

Justice Alito, writing as the sole dissenter in *Pereira*, concluded that "§ 1229(a)(1)'s language can be understood to define what makes a notice to appear *complete*," and "[u]nder that interpretation a notice that omits some of the information required by § 1229(a)(1) might still be a 'notice to appear.'" *Id.* at 2126 (Alito, J., dissenting). To support his point, Justice Alito invoke the colorful illustration involving a three-wheeled car: "In everyday life, a person who sees an old Chevy with three wheels in a junkyard would still call it a car." *Id.*

The *Pereira* majority rejected this interpretation. In rebuttal, the *Pereira* majority explained that section 1229(a)(1) "defines a 'notice to appear' as a 'written notice' that 'specif[ies],' at a minimum, the time and place of the removal proceedings." *Id.* at 2116 (alteration in original) (quoting 8 U.S.C. § 1229(a)(1)(G)(i)). Thus, it could not be that a "defective notice to appear is still a 'notice to appear' even if it is incomplete—much like a three-wheeled Chevy is still a car." *Id.* Accordingly, the *Pereira* majority rejected only the premise that "a notice to appear" can come into fruition before the government delivers all the required information in § 1229(a)(1)(A)-(G) to the noncitizen. In other words, if a car were defined to require four wheels, the three-wheeled Chevy only becomes a car after a fourth tire has been installed. Nothing in *Pereira* majority's reasoning suggests that the government may not supplement the first incomplete communication with an additional communication so that the noncitizen receives all the required information in § 1229(a)(1)(A)-(G). In the spirit of keeping

with the three-wheeled Chevy analogy, nothing prevents the government from adding a fourth tire so that the three-wheeled Chevy can finally be a car that is defined to have four wheels.

Thus, we are not persuaded by Garcia-Romo that *Pereira* compels interpreting the statute in his favor.  In fact, our holding is entirely consistent with *Pereira*.

**V.**

Also unpersuasive is the Ninth Circuit's reasoning in *Lopez v. Barr*, 925 F.3d 396 (9th Cir. 2019), which adopted the statutory interpretation advanced by Garcia-Romo.  The *Lopez* court held that "the statute speaks clearly: residence is terminated 'when the alien is served *a notice* to appear.  The use of the singular indicates that service of a single document—not multiple—triggers the stop-time rule."  925 F.3d at 402 (citations omitted) (quoting 8 U.S.C. § 1229b(d)(1)).  The Ninth Circuit reasoned that allowing the government to serve noncitizens with multiple notices to appear would contradict the statute's text and was inconsistent with *Pereira*.  *See id.* at 402, 403.

Regarding the text of the statute, the *Lopez* court emphasized the singular use of the phrase "a notice to appear" in § 1229b(d)(1).  Although the Dictionary Act, 1 U.S.C. § 1, requires that, in determining the meaning of an Act of Congress, "words importing the singular include and apply to several persons, parties, or things," the *Lopez* court declined to apply the Dictionary Act to the phrase "a notice to appear."  *See* 925 F.3d at 402.  Relying on *United States v. Hayes*, 555 U.S. 415, 422 n.5 (2009), the Ninth Circuit explained that the singular/plural rule in the Dictionary Act is designed to apply "only on the rare occasions when doing so is necessary to carry out the evident intent of the statute."  *Lopez*, 925 F.3d at 402 (cleaned up).  The Ninth Circuit determined that this "rare occasions" exception was inapplicable because "[a] single, complete Notice to Appear achieves" Congressional intent to convey time-and-place information to a noncitizen and facilitates appearance at the removal proceedings.  *See id.*  *Lopez* also rejected the interpretation we have adopted because, according to the Ninth Circuit, it would require reading the statute as stating that "the stop-time provision would be triggered 'when the alien is served *notices* to appear under section 1229(a).'"  *Id.* at 402.

However, the interpretation of § 1229b(d)(1) does not even hinge on the significance of whether the phrase "a notice to appear" should be read in the singular or the plural. Therefore, the Dictionary Act is not relevant to the statutory interpretation issue we are deciding. As explained above, the plain and ordinary meaning of the word "a" as used in context naturally contemplates that service of the required information can be achieved through written communication in multiple installments. *See supra*, at 8–12. Our interpretation of the statute is *not* that there can be "multiple notices to appear," as the Ninth Circuit characterizes the statutory interpretation we adopt. We agree with the Ninth Circuit that the statute calls for only one "notice to appear." But that proposition does not answer the question of whether the requisite informational components of "a notice to appear" may be provided through multiple written communications. The *Lopez* court did not consider this particular question; therefore, we find its analysis of the statute to be incomplete.

Further, the Ninth Circuit misreads *Pereira*. The *Lopez* court suggests that *Pereira* established a binary inquiry for determining whether a document is "a notice to appear": either the document contains all the required information under § 1229(a)(1)(A)-(G) (rendering it a true "notice to appear') or it does not (rendering it a "putative notice to appear"). *See* 925 F.3d at 402, 403 ("Nevertheless, no matter how many documents are sent, none qualifies as a 'notice to appear' unless it contains the information Section 1229(a) prescribes."). To support its reading of *Pereira*, the Ninth Circuit noted that "the Supreme Court held that Section 1229(a)(1) *defines* what a notice to appear is, and that the definition is imported every time the term 'notice to appear' is used in the statute—especially when it is used in the stop-time rule, 8 U.S.C. § 1229b(d)(1), which refers to 'a notice to appear under section 1229(a).'" *Lopez*, 925 F.3d at 403 (quoting *Pereira*, 138 S. Ct. at 2116). Thus, under this reading, the government lacks the ability to supplement its first communication with a second one.

The analytical problem with this conclusion is that it rests on the assumption that a subsequent written communication cannot "cure the defect in the initial" communication. *See Lopez*, 925 at 407 (Callahan, J., dissenting). In fact, the *Pereira* opinion "says nothing about whether a" deficient initial communication "can be cured by a subsequent document that fully provides specific time, date, and place information." *Id.* And thus, while we agree with the

*Lopez* court that a noncitizen receives "a notice to appear" only after she or he has received all the required information listed under § 1229(a)(1)(A)-(G), "it does not follow that all the criteria listed in § 1229(a) *must* be contained in a single document." *Id.*

**VI.**

Lastly, our holding accords with the BIA's interpretation of the statute set forth in its en banc opinion in *In re Mendoza-Hernandez*, 27 I. & N. Dec. 520 (B.I.A. 2019) (en banc). There, the BIA held that "where a notice to appear does not specify the time and place of an alien's initial removal hearing, the subsequent service of a notice of hearing containing that information 'perfects' the deficient notice to appear, satisfies the notice requirements of section [1229(a)(1)], and triggers the 'stop-time' rule of section [1229b(d)(1)(A)]." *Id.* at 535. The BIA explained, "[W]e do not read the statute as requiring that the 'written notice' be in a single document. Rather it may be provided in one or more documents—in a single or multiple mailings . . . so long as the essential information is conveyed in writing and fairly informs the alien of the time and place of the proceedings." *Id.* at 531.

When the BIA interprets the Immigration and Nationality Act, its interpretation is eligible for *Chevron* deference. *See Negusie v. Holder*, 555 U.S. 511, 516–17 (2009). The BIA's entitlement to deference hinges on the result of a two-step test we must employ. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). First, after "applying the ordinary tools of statutory construction," we must determine if the statute is ambiguous. *Id.* "If the statute is unambiguous, then the court applies it as-written; 'that is the end of the matter.'" *Arangure v. Whitaker*, 911 F.3d 333, 337–38 (6th Cir. 2018) (quoting *City of Arlington*, 569 U.S. at 296). But if we were to conclude that the statute was ambiguous, then we would be required to defer to the agency's interpretation of the statute provided that it is a "permissible" interpretation. *City of Arlington*, 596 U.S. at 296. In other words, the agency's interpretation must be "within the bounds of reasonable interpretation." *Id.*

We have concluded that the relevant statutory text is unambiguous and that its ordinary meaning allows for the government to provide non-citizens with the required categories of information under § 1229(a)(1)(A)-(G) using multiple documents. Accordingly, we need not

defer to the BIA's interpretation of the statute. But even if we had to defer under *Chevron*, that would not change the outcome here because, as noted, the BIA agrees with our interpretation of statute.

If we were to accept Garcia-Romo's strict construction of § 1229b(d)(1) as a reasonable interpretation of the statute, it would at most suggest that § 1229b(d)(1) is subject to at least two reasonable interpretations. "When a statute ambiguously lends itself to more than one interpretation, we may not substitute one party's construction of the statute for a reasonable interpretation issued by the agency charged with administering it." *Gonzalez-Garcia v. Holder*, 770 F.3d 431, 434 (6th Cir. 2014), *abrogated on other grounds by Pereira*, 138 S. Ct. at 2114. Accordingly, the government's interpretation would nonetheless prevail even had we credited Garcia-Romo's interpretation. Under *Chevron*, we would defer to the BIA's statutory interpretation, which is the same as our own.

## VII.

For the foregoing reasons, we **DENY** the petition for review.