RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0036p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT



TAKHIR ASHIROVICH KHAYTEKOV,

      *Petitioner*,

   *v.*

MERRICK B. GARLAND, Attorney General,

      *Respondent*.

No. 19-3149

On Remand from the United States Supreme Court.
Petition for Review from the Board of Immigration Appeals;
No. A 094 219 176.

Decided and Filed:  February 25, 2022

Before:  SILER, COLE, and MURPHY, Circuit Judges.

_____

### COUNSEL

**ON SUPPLEMENTAL BRIEF:**  George P. Mann, Maris J. Liss, GEORGE P. MANN AND
ASSOCIATES, Farmington Hills, Michigan, for Petitioner.  Karen L. Melnik, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

### OPINION

_____

MURPHY, Circuit Judge.  Often described as an immigration "death sentence," a finding
that an immigrant "knowingly made a frivolous application for asylum" renders the immigrant
"permanently ineligible for any benefits under" our immigration laws.  8 U.S.C. § 1158(d)(6);
*see, e.g.*, *Yousif v. Lynch*, 796 F.3d 622, 627 (6th Cir. 2015).  Yet Congress understandably
refused to impose this serious penalty on asylum seekers who file frivolous applications unless
they receive adequate notice "of the consequences" of doing so.  8 U.S.C. § 1158(d)(4)(A),

(d)(6). To fulfill this notice mandate, the government has placed the required warning about filing a frivolous asylum application in the standard application form itself.

Takhir Khaytekov received this written warning, but immigration judges also routinely give another verbal warning in court. The judge in Khaytekov's case did not give this secondary warning, and Khaytekov argues that the failure to do so violated § 1158(d)'s notice requirement. In an earlier opinion, we opted to reject Khaytekov's claims for relief on narrower grounds that avoided this statutory question. But the Supreme Court has since remanded the case for reconsideration in light of *Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021), and we now must confront it. We see nothing in § 1158(d)'s text that requires the additional warning that Khaytekov requests. And we agree with every other circuit court that has considered the issue by concluding that the warning in the application form itself satisfies the statute's notice requirement. Because Khaytekov does not dispute that he filed a frivolous asylum application, he is permanently barred from obtaining any immigration "benefits." 8 U.S.C. § 1158(d)(6). So our judgment remains the same after *Niz-Chavez*: we dismiss Khaytekov's petition for review in part and deny it in part.

I

Khaytekov, a citizen of Uzbekistan, came to this country in 2001 on a temporary visa. After he overstayed his visa by many years, the government instituted proceedings to remove him. Khaytekov sought asylum. His asylum application alleged that he had been persecuted "by nationalist[s] and fascist[s]" in Uzbekistan because of his religion, nationality, and political opinion. Admin. R. (A.R.) 1313. It also asserted that Khaytekov feared "physical attacks" if he returned to the country. A.R. 1314.

While his removal proceedings were pending, Khaytekov married a U.S. citizen. He thus withdrew his request for asylum and instead applied to adjust his status to lawful permanent resident. This application required him to show that he was "admissible" into the United States. 8 U.S.C. § 1255(a). But immigrants become "inadmissible" (and so ineligible for adjustment of status) if they misrepresent material facts to obtain an immigration benefit. *Id.* § 1182(a)(6)(C)(i). An immigration judge found Khaytekov inadmissible on this ground because of a litany of lies that he told during his immigration proceedings. The judge noted, among other

things, that Khaytekov had filed a "completely fabricated" asylum application.    A.R. 390. Khaytekov later admitted that the application contained false information because he had not been persecuted in Uzbekistan and did not fear returning there.    He also admitted that he included this false information in the application because he thought it would increase his chances to remain in the United States.

Yet the Attorney General has discretion to waive the inadmissibility of immigrants like Khaytekov who lie in their immigration proceedings if their removal would cause "extreme hardship" to certain relatives in the United States.    8 U.S.C. § 1182(i)(1).    Khaytekov requested this waiver.    The immigration judge denied it for three reasons.    The judge held that Khaytekov had knowingly filed a frivolous asylum application, which rendered him "permanently ineligible" for any benefits under the immigration laws.    *Id.* § 1158(d)(6).    The judge next found that Khaytekov's wife would not suffer extreme hardship from his removal.    The judge lastly determined that Khaytekov's repeated falsehoods showed that he did not warrant a favorable exercise of the Attorney General's discretionary waiver authority.    Ultimately, the judge described Khaytekov as "one of the most remarkably and demonstrably dishonest people with whom this Court has dealt in well over 30 years of experience on the bench."  A.R. 392–93.

Khaytekov appealed to the Board of Immigration Appeals.    In addition to challenging the immigration judge's opinion, he filed motions to remand based on new precedent and new evidence and a motion for the Board to appoint a three-judge panel.    As relevant now, he moved to remand on the ground that a recent Supreme Court decision made him eligible for cancellation of removal.    *See Pereira v. Sessions*, 138 S. Ct. 2105 (2018).    This relief allows the Attorney General to cancel the removal of immigrants who meet various requirements, including that they have been physically present in the United States for 10 years.    8 U.S.C. § 1229b(b)(1)(A). Under a rule that has come to be called the "stop-time rule," immigrants must satisfy the requirement of 10 years' physical presence on the date that the government serves them with a "notice to appear" commencing their removal proceedings.    *Id.* § 1229b(d)(1).    In *Pereira*, the Supreme Court held that an invalid notice to appear that does not contain all necessary information (including the date and location of the removal hearing) cannot stop this 10-year clock.    *See* 138 S. Ct. at 2110.    The decision thus gave immigrants who receive invalid notices to appear more time to satisfy the 10-year presence requirement because the clock will continue to

run until they receive a valid notice to appear. Khaytekov claimed that he received an invalid notice without the required date and location information and thus that he had been in the country for 10 years. He argued that he qualified for cancellation of removal after *Pereira*.

The Board denied Khaytekov's motions and upheld the immigration judge's decision. Despite Khaytekov's request for a remand to apply for cancellation of removal, it distinguished *Pereira* on the (mistaken) ground that Khaytekov did not seek that form of relief. It next found that the immigration judge properly held that Khaytekov's frivolous asylum application disqualified him from any benefits under the immigration laws. *See* 8 U.S.C. § 1158(d)(6). And even if the judge was wrong in that regard, the Board also agreed that Khaytekov did not deserve a discretionary waiver of the ban on adjustment of status that applies to immigrants who lie in their removal proceedings. *See id.* § 1182(i)(1).

Khaytekov petitioned this court to review the Board's order. We originally dismissed his petition in part and denied it in part. *Khaytekov v. Barr*, 794 F. App'x 497, 503 (6th Cir. 2019). We held that we lacked jurisdiction to consider the Board's denial of Khaytekov's motion to remand for the consideration of new evidence, and we found that the Board had properly denied his motion to appoint a three-member panel. *Id.* at 499–501. Although we next recognized that the Board had wrongly distinguished *Pereira* on the ground that Khaytekov was not seeking cancellation of removal, we found its misstatement harmless because Khaytekov was still ineligible for that relief. *Id.* at 502. Under our then-existing precedent, the government could trigger the cancellation-of-removal statute's "stop-time rule" by sending a second notice to an immigrant that included the date and location information missing from the first notice. *Id.* (citing *Garcia-Romo v. Barr*, 940 F.3d 192, 199–203 (6th Cir. 2019)). Because Khaytekov had not been in this country for 10 years when he received a second notice, he remained ineligible for cancellation of removal under *Garcia-Romo*. *Id.* We lastly declined to consider Khaytekov's argument that he had not filed a frivolous asylum application because he could not obtain any of his requested remedies no matter how we ruled on that more far-reaching issue. *Id.* at 502–03.

After our decision, the Supreme Court overruled *Garcia-Romo* in *Niz-Chavez*. *Niz-Chavez* held that only a single document could qualify as a "notice to appear" that triggered the "stop-time rule." *See* 141 S. Ct. at 1480–85. It thus rejected *Garcia-Romo*'s holding that the government could trigger that rule by sending multiple notices containing all necessary information. *Id.* Khaytekov had petitioned the Supreme Court for certiorari on this question. The Court granted his petition, vacated our judgment, and remanded this case for reconsideration in light of *Niz-Chavez*. *See Khaytekov v. Garland*, 141 S. Ct. 2591, 2592 (2021).

II

As we noted in our last opinion, the Board mistakenly stated that Khaytekov had not sought cancellation of removal because he requested that relief in a motion to remand. *Khaytekov*, 794 F. App'x at 502. Our prior opinion found this misstatement harmless on the ground that Khaytekov could not satisfy cancellation of removal's physical-presence requirement. As the government concedes, *Niz-Chavez* rejected this part of our reasoning. Immigration authorities did not send Khaytekov a single document with all of the information that a notice to appear must contain. Under *Niz-Chavez*, then, he never received a valid "notice to appear" that triggered the stop-time rule, and he had lived in the country for the 10-year period required to qualify for cancellation of removal by the end of his removal proceedings. *See* 8 U.S.C. § 1229b(b)(1)(A). Nevertheless, the Board's misstatement continues to be harmless, so we need not remand to allow it to consider Khaytekov's request. He remains ineligible for cancellation of removal on a distinct ground: the Board correctly held that he filed a frivolous asylum application.

A

"Refugees" who will face persecution in their home countries because of various protected traits (such as their religion or political opinion) may ask the Attorney General to grant them asylum. 8 U.S.C. § 1158(b)(1)(A); *id.* § 1101(a)(42)(A). To deter meritless asylum requests, however, the asylum statute imposes a significant penalty on the filing of frivolous applications:

> If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph

(4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

*Id.* § 1158(d)(6). This text in paragraph (d)(6) imposes two general requirements before the government can permanently bar immigrants from obtaining any immigration-related "benefits." To begin with, an immigrant must have "knowingly made a frivolous application." *Id.* Next, the immigrant must have "received the notice under paragraph (4)(A)." *Id.* Paragraph (4)(A), in turn, requires "the Attorney General" to "advise" immigrants "[a]t the time of filing an application for asylum" "of the consequences, under paragraph (d)(6), of knowingly filing a frivolous application for asylum[.]" *Id.* § 1158(d)(4)(A).

When the Board concludes that paragraph (d)(6)'s penalty applies to an asylum seeker due to a frivolous application, we review any underlying factual findings (such as the finding that the asylum seeker acted with the required knowledge) under the deferential substantial-evidence test. *See Lazar v. Gonzales*, 500 F.3d 469, 474–75 (6th Cir. 2007); *see also Alexandrov v. Holder*, 475 F. App'x 41, 46, 48–49 (6th Cir. 2012). But we review any legal conclusions (such as a conclusion about the proper meaning of the language in § 1158(d)(6)) de novo. *See Yousif*, 796 F.3d at 628.

B

This statutory scheme bars Khaytekov's request for cancellation of removal. At the outset, he does not dispute two things necessary to trigger paragraph (d)(6)'s penalty. Khaytekov does not challenge the finding that his application was "frivolous" within the meaning of that paragraph. 8 U.S.C. § 1158(d)(6); *see* 8 C.F.R. § 1208.20(a)(1). Khaytekov also does not dispute that cancellation of removal qualifies as one of the "benefits" that he cannot obtain if he knowingly made a frivolous application. 8 U.S.C. § 1158(d)(6); *cf. Albu v. Holder*, 761 F.3d 817, 819 (7th Cir. 2014); *Aziz v. Gonzales*, 478 F.3d 854, 858 (8th Cir. 2007). Khaytekov instead argues that he never "filed" or "made" his application and that, in any event, he did not receive adequate notice of the consequences of filing a frivolous application. We will discuss each argument in turn.

1

Khaytekov initially asserts that he only "lodged" his asylum application (and did not "file" it) with the immigration court. In his view, this fact means that he never "*made* a frivolous application*" (under paragraph (d)(6)), and that he was never advised of the consequence of "knowingly *filing* a frivolous application" "[a]t the time of *filing*" (under paragraph (d)(4)(A)). His claimed distinction between lodging and filing rests on the standard I-589 asylum application. 8 C.F.R. § 1208.3(a). An immigrant must sign this application and certify its accuracy in Part D of the form. A.R. 1317. Immigrants also typically sign either Part F or Part G at some later time. Part F covers immigrants who apply for asylum before the government has initiated proceedings against them. These applicants reaffirm the accuracy of their applications by signing Part F during interviews with asylum officers. A.R. 1318. Part G covers immigrants who (like Khaytekov) apply for asylum after the government has initiated those proceedings. These applicants reaffirm the accuracy of their applications by signing Part G during a hearing before an immigration judge. *Id.* Khaytekov claims that immigrants do not officially "make" or "file" applications under paragraphs (d)(4)(A) and (d)(6) until they sign Part F or Part G. And because he submitted his application to the immigration court without signing Part G, his argument goes, he never "made" or "filed" it (even if it was frivolous).

Neither the law nor the facts support this reading. Legally, Khaytekov identifies nothing in the asylum statute or its implementing regulations that treats an asylum application as unfiled (or merely "lodged," in his words) until an immigrant signs Part F or Part G. The asylum statute tells the Attorney General to "establish" the "procedure" for processing applications. 8 U.S.C. § 1158(d)(1). The applicable regulation at the relevant time said nothing about "lodging" applications. 8 C.F.R. § 1208.4(b) (2008). Rather, it ordered immigrants to "file" their applications in different ways, depending on their circumstances. If an immigrant was not yet in immigration proceedings, applications needed to "be filed directly by mail" to the relevant asylum office's service center. *Id.* § 1208.4(b)(1). If an immigrant was already in proceedings, applications needed to "be filed directly with the" immigration court. *Id.* § 1208.4(b)(3). The rules of procedure of these courts further clarified only that applications "must be filed with the Immigration Court having administrative control over the Record of Proceeding." 8 C.F.R. § 1003.31(a) (2008). (The courts have since begun to transition to electronic filing. 86 Fed.

Reg. 70,708 (Dec. 13, 2021).) Khaytekov identifies no other specific regulatory guidance on the mechanics of these court filings. Under the usual understanding of the word, though, a party "files" a "legal document" with a court by "deliver[ing]" it "to the court clerk or record custodian for placement into the official record." *Black's Law Dictionary* 642 (7th ed. 1999).

Factually, that is what happened here. The immigration judge and Board both found that Khaytekov filed his application by placing it in the official record at a hearing on February 25, 2008. A.R. 6 n.1, 389. Substantial evidence supports this factual finding. *See Lazar*, 500 F.3d at 474–75. At the beginning of the hearing, the immigration judge inquired of Khaytekov if the hearing had been "set for you to file your applications for relief." A.R. 1009. Khaytekov's counsel responded, "That's correct, Your Honor." *Id.* The asylum application then made its way into the record. The immigration court stamped it "received in court" on February 25, 2008. A.R. 1309. Khaytekov had also signed Part D of the application and certified its accuracy. A.R. 1317. But the parties (apparently) could not immediately proceed to the application's merits at this hearing because they discovered that Khaytekov had not complied with various fingerprinting requirements. *See* 8 U.S.C. § 1158(d)(1); 8 C.F.R. § 1003.47(d) (2008). The judge thus ended the hearing, and Khaytekov did not sign Part G.

The parties' conduct at the next hearing after Khaytekov got married confirms that he filed his asylum application. His counsel asked "that Mr. Khaytekov's I-589 be withdrawn" so that he could proceed with his adjustment-of-status application. A.R. 1013–14. The judge warned Khaytekov that he could not seek asylum again and stated that the record "will show that application being withdrawn." A.R. 1014–15. Yet if Khaytekov had never filed his application, he would have had nothing to withdraw. And immigrants who file frivolous applications cannot avoid a finding that their applications were frivolous by later withdrawing them. *See Lazar*, 500 F.3d at 476–77; *cf. Ghazali v. Holder*, 585 F.3d 289, 293 (6th Cir. 2009).

The asylum statute's overall structure also shows that, contrary to Khaytekov's claim, parties can "file" asylum applications even if they have not signed Parts F or G. We presume that a word like "file" bears the same meaning when used more than once in the same section. *See Mohasco Corp. v. Silver*, 447 U.S. 807, 815–17, 826 (1980); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73 (2012). And two other uses of

this word in § 1158 suggest that immigrants "file" their applications before the interviews or hearings at which they sign Part F or Part G. Although the statute allows the Attorney General to establish claims-processing rules, it adds that, "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is *filed*[.]" 8 U.S.C. § 1158(d)(5)(A)(ii) (emphasis added). This provision contemplates that an application's filing will occur before the initial interview or hearing.

Likewise, the asylum statute generally bars relief unless an "application has been *filed* within 1 year" of an immigrant's arrival in the United States. *Id.* § 1158(a)(2)(B) (emphasis added). Khaytekov's reading creates the risk that immigrants will file untimely applications through no fault of their own. Suppose an asylum seeker who has yet to be placed in immigration proceedings files an application through the mail. 8 C.F.R. § 1208.4(b)(1). Suppose further that the government receives the mailed application 350 days after the applicant's entry into the United States, but an officer does not schedule an interview for 40 days (at which point the applicant signs Part F). Did the applicant "file" an untimely application because this signature occurred over a year after entry? Under the relevant regulation, the answer is a resounding "no" because the filing occurred earlier. *Id.* § 1208.4(a)(2)(ii). Yet Khaytekov's reading would lead to the contrary result.

Khaytekov nevertheless says that a different regulation compels his interpretation. *Id.* § 1208.3(c)(3). This regulation directs immigration courts to reject "incomplete" asylum applications and treats an application as "incomplete" if an immigrant does not respond to all required questions, pay the required fees, or sign the application. *Id.* Khaytekov asserts that applications remain "incomplete" under this regulation until applicants also sign Part F or Part G, so he argues that the immigration judge should have rejected his application for filing until he signed Part G. But the application itself directs immigrants not to complete Part F or Part G until their interview or hearing after they have already filed it. A.R. 1318. So the absence of this second signature did not render the application "incomplete" for filing and did not provide a basis for rejecting the application under § 1208.3(c)(3).

In short, Khaytekov "made" and "filed" his application under the relevant provisions when he submitted it for entry into the record on February 25, 2008. And nothing in the statute or regulations required him to sign Part G for his application to be considered "made" or "filed."

2

Even if he did make a frivolous application, Khaytekov next argues, that fact would satisfy only one of the two statutory requirements for triggering paragraph (d)(6)'s penalty. The government also must show that he "received the notice under paragraph (4)(A)." 8 U.S.C. § 1158(d)(6). Yet Part D of the application itself provided this notice. A.R. 1317. Just above Khaytekov's signature, this part contains a standard (and bolded) "*WARNING*" in which immigration authorities informed Khaytekov: "Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits" under the immigration laws. *Id.* The warning noted further: "You may not avoid a frivolous finding simply because someone advised you to provide false information in your asylum application." *Id.* In addition, Khaytekov marked that his attorney prepared the application for him. *Id.* His attorney signed a separate certification indicating that "the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence." *Id.* This combination of warnings and signatures refutes Khaytekov's claim that he did not "receive[]" the required "notice." 8 U.S.C. § 1158(d)(6).

Khaytekov responds that most applicants who are in immigration proceedings typically get another verbal warning from an immigration judge at the hearing at which they both file their application and sign Part G. *Cf. Brushtulli v. Holder*, 594 F. App'x 282, 286 (6th Cir. 2014); *Ceraj v. Mukasey*, 511 F.3d 583, 589 (6th Cir. 2007). When they sign Part G, asylum seekers likewise reaffirm that they know of the consequences of filing a frivolous application. A.R. 1318. But the record in this case contains no evidence that the immigration judge gave any additional verbal warning, and Khaytekov did not fill out Part G. *Id.* Because Khaytekov did not receive this secondary warning, he claims that he lacked legally sufficient notice under paragraph (d).

Both text and precedent rebut his interpretation. Nothing in paragraph (d)(6)'s language requires immigration judges to give verbal notice on top of the application's written notice. According to the paragraph, Khaytekov must have "received the notice under paragraph (4)(A)[.]" 8 U.S.C. § 1158(d)(6). The "under" in this paragraph likely means "in accordance with" or "according to." *Pereira*, 138 S. Ct. at 2117 (quoting 18 *Oxford English Dictionary* 950 (2d ed. 1989); *Black's Law Dictionary* 1525 (6th ed. 1990)). And the application's standard written notice is "in accordance with" the notice described in paragraph (d)(4)(A). The notice warned Khaytekov of the "consequences" "of knowingly filing a frivolous application"—namely, that he would be "permanently ineligible for any benefits" under the immigration laws. 8 U.S.C. § 1158(d)(4)(A), (d)(6); A.R. 1317. And although paragraph (d)(4)(A) says that the "Attorney General shall" "advise" asylum seekers of these consequences, it does not dictate a verbal warning over a written one or otherwise identify the manner in which he must do so. Similarly, although the Attorney General did not personally deliver this written notice to Khaytekov, the immigration laws have long allowed him to "delegate such authority" as he deems appropriate to subordinates. 8 U.S.C. § 1103(g)(2). That is why, for example, an immigration judge rather than the Attorney General typically "determines" whether an asylum seeker "has knowingly made a frivolous application" under paragraph (d)(6). *See* 8 C.F.R. § 1003.10(a).

Perhaps Khaytekov's best textual counterargument concerns the required timing of this notice. Paragraph (d)(4)(A) suggests that immigration authorities must "advise" asylum seekers of the relevant consequences at a specific time: "[a]t the time of filing an application[.]" 8 U.S.C. § 1158(d)(4). If Khaytekov received the warning when his attorney reviewed the application with him at some unknown *earlier* point, does this written notice qualify as given "at the time" of the application's filing during his February 2008 hearing? We think so. Because the authorities made the written warning a part of the application *itself*, the warning does not disappear at the time of filing. Rather, it gets filed along with the rest of the application. *See Cheema v. Holder*, 693 F.3d 1045, 1050 (9th Cir. 2012). The warning exists just as much at that time as it did when the applicant initially filled out and signed the application form.

The statutory structure confirms this point. As noted, it contemplates that a "filing" can occur before any in-person interview or hearing. *See* 8 U.S.C. § 1158(d)(5)(A)(ii). So asylum

seekers who are not yet in immigration proceedings file their applications through the mail. 8 C.F.R. § 1208.4(b)(1). How else can immigration authorities provide these applicants with the required notice "at the time of filing" but through a written notice on the application itself? *See Niang v. Holder*, 762 F.3d 251, 254 (2d Cir. 2014) (per curiam). A contrary reading would effectively compel in-person filings in all cases—even though nothing in the statute suggests that requirement and even though a regulation has long required mail filings in certain settings. By making filing more burdensome, moreover, such a rule might harm applicants more than it helps them, especially considering that they must file their applications within a year of entry into the United States. *See* 8 U.S.C. § 1158(a)(2)(B).

Precedent points in the same direction. Six other circuit courts have held that the asylum application's written warning satisfies paragraph (d)'s notice requirements. *See Ndibu v. Lynch*, 823 F.3d 229, 234–36 (4th Cir. 2016); *Niang*, 762 F.3d at 253–55; *Ruga v. U.S. Att'y Gen.*, 757 F.3d 1193, 1196–97 (11th Cir. 2014); *Pavlov v. Holder*, 697 F.3d 616, 618 (7th Cir. 2012); *Cheema*, 693 F.3d at 1048–49; *Ribas v. Mukasey*, 545 F.3d 922, 928–30 (10th Cir. 2008). As these courts explained, an immigration judge has discretion to give a verbal warning at the start of an immigration hearing, but nothing in the statute requires the judge to do so if an applicant received the application's written warning. *See Ndibu*, 823 F.3d at 236; *Niang*, 762 F.3d at 254.

Admittedly, these six cases involved immigrants who (unlike Khaytekov) had applied for asylum *before* immigration authorities initiated removal proceedings against them. After the immigrants filed their applications, therefore, asylum officers gave an additional verbal warning during their asylum interviews (and some immigrants appear to have signed Part F of the application acknowledging the consequences of frivolous filings). *See Ndibu*, 823 F.3d at 230, 234; *Niang*, 762 F.3d at 252; *Ruga*, 757 F.3d at 1195; *Pavlov*, 697 F.3d at 618; *Cheema*, 693 F.3d at 1046–47; *Ribas*, 545 F.3d at 924. Khaytekov claims that these decisions rely on this secondary warning as the ground for finding the statutory notice mandate satisfied. And since he received only the application's written warning, he claims, his notice falls short under their logic.

Although Khaytekov is correct on his factual claim that the immigrants in these other cases received an additional warning, he is wrong on his legal claim about the scope of their holdings. The cases all hold, quite explicitly, that "the notice set forth in the I-589 application

for asylum suffices to satisfy the requirement under § 1158(d)(4)(A) that the applicant be notified of the consequences of filing a frivolous application." *Ndibu*, 823 F.3d at 236; *see also Niang*, 762 F.3d at 254; *Ruga*, 757 F.3d at 1197; *Pavlov*, 697 F.3d at 618; *Cheema*, 693 F.3d at 1049; *Ribas*, 545 F.3d at 930. None of the decisions rested on the secondary warning. The Tenth Circuit even questioned whether that later warning gave "meaningful notice at all" because the immigrant received it only *after* he had filed his application—not *at the time* of filing. *Ribas*, 545 F.3d at 930. Just as the immigrants in these cases had adequate notice when they mailed in their applications, so too Khaytekov had adequate notice when he submitted his application to the immigration court.

To be sure, these courts recognized the possibility that this written warning might not suffice if an applicant did not adequately learn of it—say, because the applicant does not speak English and the person who completed the application did not pass along this information. *See, e.g.*, *Ndibu*, 823 F.3d at 235 n.4; *Niang*, 762 F.3d at 254 n.1; *Cheema*, 693 F.3d at 1049 n.4. In that respect, Khaytekov suggested at his final hearing that his lawyer failed to go over his application with him before he signed it. A.R. 472–77. At an earlier hearing, however, Khaytekov testified to the contrary—that his attorney did, in fact, review the application with him. A.R. 1064. And the attorney attested to having done so on the application itself. A.R. 1317. So substantial evidence supports the conclusion that Khaytekov received the required notice. *See Pavlov*, 697 F.3d 618–19.

\* \* \*

In sum, the Supreme Court's decision in *Niz-Chavez* overturned our earlier conclusion that Khaytekov could not obtain cancellation-of-removal relief because he could not satisfy that relief's physical-presence requirement. Even after that decision, however, Khaytekov remains ineligible for cancellation of removal because he filed a frivolous asylum application. And *Niz-Chavez* does not affect any other aspect of our earlier opinion, so we simply incorporate the other parts by reference. *See Khaytekov*, 794 F. App'x at 499–501.

We dismiss Khaytekov's petition for review in part and deny it in part.